Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 1 of 148 PageID #: 5

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

ABRUZZO DOCG INC. d/b/a TARALLUCCI E VINO; AURIFY BRANDS, LLC; BIG DADDY'S II LLC d/b/a DUKE'S; BOQUERIA OPERATIONS, LLC; BRANDED RESTAURANT HOLDINGS, LLC; BROADWAY SRJ, LLC; CAPTAIN HADDOCK LLC; CITY WINERY LLC; ESS-A-BAGEL, INC. d/b/a ESS-A-BAGEL; ESS-A-BAGEL, 883 SIXTH AVENUE, LLC d/b/a ESS-A-BAGEL; FGNY PARENTCO, LLC; FOOD FOR JUNIOR'S INC.; FOURTH WALL RESTAURANTS, LLC d/b/a QUALITY BRANDED; FOX SRJ, LLC; GEORGE MARCEL LLC d/b/a FAIRFAX; GG CAMPBELL, LLC d/b/a THE CAMPBELL; GLOBAL DINING, INC. OF CALIFORNIA; GRAMERCY FARMER & THE FISH LLC d/b/a FARMER & THE FISH; GRAND CENTRAL OYSTER BAR INC. d/b/a GRAND CENTRAL OYSTER BAR; HAPPY COOKING LLC d/b/a JOSEPH LEONARD; HH BOWEN LLC d/b/a HARLEM HOOKAH; IL RIFUGIO INC. d/b/a TALLUCCI E VINO; JAVELINA TEX-MEX LLC d/b/a JAVELINA; LA VECCHIA LLC d/b/a TARALLUCCI E VINO; LE-SE AMSTERDAM 732 RESTAURANT, INC. d/b/a DIVE BAR; LITTLE WISCO LLC d/b/a FEDORA; MANNAGGIA INC. d/b/a TARALLUCCI E VINO; MF PEASANT, LLC d/b/a PEASANT RESTAURANT; MONOPOLIO LLC d/b/a TARALLUCCI E VINO; PENMANSHIP LLC d/b/a JEFFREY'S GROCERY; PHYSICAL ONION LLC d/b/a HARDWARE BAR; PIECES BAR LLC d/b/a PIECES BAR; RACINES NYC LLC; RAINBOW STARSHIP LLC d/b/a PLAYHOUSE BAR; RHLP 45 LLC; RHLP 284 LLC; SCHNIPPER RESTAURANTS, LLC; SEINFELD SQUARED LLC d/b/a DIVE BAR 106; ST. HELENE LLC d/b/a BAR SARDINE; STATE OF MIND HOLDINGS, LLC; STOUT, INC.; THREE HOOPLES, LTD. d/b/a BROADWAY DIVE BAR; TITO ROCKS LLC; UNION SQUARE HOSPITALITY GROUP LLC; 93 LUDLOW STREET INC. d/b/a THE DL AND DINNER ON LUDLOW; 101 WEST 75 BAR AND REST. ENTERPRISES, LTD. t/a BROADWAY DIVE BAR; 125 HOSPITALITY LLC d/b/a CAFE WHA?; 239 PARK AVENUE SOUTH ASSOCIATES LLC d/b/a BIG DADDY'S; 389 BROOME LLC d/b/a GOLDBAR; 560 THIRD AVENUE GROCERY CORP. d/b/a DUKE'S ORIGINAL ROADHOUSE; 643 BROADWAY HOLDINGS LLC d/b/a SWEETWATER SOCIAL; 1395 SECOND AVENUE RESTAURANT LLC d/b/a JAVELINA; 1626 SRJ, LLC;

Index No.

**SUMMONS AND COMPLAINT**

*Plaintiffs,*

    v.

ACCEPTANCE INDEMNITY INSURANCE COMPANY;  ADMIRAL INDEMNITY COMPANY; ARCH INSURANCE COMPANY;

[Caption continued on next page]

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 2 of 148 PageID #: 6

[Caption continued from previous page]

ASPEN AMERICAN INSURANCE COMPANY; AXIS INSURANCE
COMPANY; FIRST MERCURY INSURANCE COMPANY; GREENWICH
INSURANCE COMPANY; HARTFORD FIRE INSURANCE COMPANY;
HDI GLOBAL INSURANCE COMPANY; INDEMNITY INSURANCE
COMPANY OF NORTH AMERICA; LEXINGTON INSURANCE
COMPANY; METROPOLITAN PROPERTY AND CASUALTY
INSURANCE COMPANY; NATIONAL FIRE & MARINE INSURANCE
COMPANY; OHIO SECURITY INSURANCE COMPANY; SENTINEL
INSURANCE COMPANY LTD.; SOMPO AMERICA INSURANCE
COMPANY; STRATHMORE INSURANCE COMPANY; THE CHARTER
OAK FIRE INSURANCE COMPANY; TRAVELERS CASUALTY
INSURANCE COMPANY OF AMERICA; TRAVELERS EXCESS AND
SURPLUS LINES COMPANY; TWIN CITY FIRE INSURANCE COMPANY;
UNITED NATIONAL INSURANCE COMPANY; UNITED SPECIALTY
INSURANCE COMPANY; UTICA FIRST INSURANCE COMPANY;
WESTERN WORLD INSURANCE COMPANY; XL INSURANCE
AMERICA, INC.; ZURICH AMERICAN INSURANCE COMPANY;

*Defendants.*

**TO THE ABOVE NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve

your Answer on the Plaintiffs' attorneys within twenty (20) days after the service of the

Summons, exclusive of the date of service (or within thirty (30) days after service is complete if

this Summons is not personally delivered to you within the State of New York); and in case of

your failure to appear or answer, judgment will be taken against you by default for the relief

demanded therein.

Plaintiffs designate Kings County as the place of trial; Venue is based on C.P.L.R § 503.

Dated: August 3, 2020
       New York, New York

/S/ Jeremy M. Creelan

Jeremy M. Creelan

Michael W. Ross
Seth H. Agata
Jenna E. Ross
JENNER & BLOCK LLP
919 Third Ave., 38th Floor
New York, NY 10022
Telephone: 212-891-1678
Email: jcreelan@jenner.com

John H. Mathias Jr. (*pro hac vice*
forthcoming)
David M. Kroeger
Brian S. Scarbrough (*pro hac vice*
forthcoming)
Jan A. Larson (*pro hac vice* forthcoming)
Gabriel K. Gillett
Caroline L. Meneau (*pro hac vice*
forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: 312-923-2917
Email: jmathias@jenner.com

To:   Acceptance Indemnity Insurance Company
      c/o Kenneth C. Coon
      1314 Douglas Street Suite 1600
      Omaha, NE 68102

      Admiral Indemnity Company
      c/o Department of Financial Services
      One State Street
      New York, NY 10004-1511

      Arch Insurance Company
      c/o New York State Department of Financial Services
      One State Street
      New York, NY 10004-1511

      Aspen American Insurance Company
      c/o New York State Department of Financial Services
      One State Street
      New York, NY 10004-1511

      AXIS Insurance Company

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 4 of 148 PageID #: 8

c/o New York State Department of Financial Services
One State Street
New York, NY 10004-1511

First Mercury Insurance Company
c/o Sonia Scala
Crum & Forster
305 Madison Ave.
Morristown, NJ 07962

Greenwich Insurance Company
c/o New York State Department of Financial Services
One State Street
New York, NY 10004-1511

Hartford Fire Insurance Company
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

HDI Global Insurance Company
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

Indemnity Insurance Company of North America
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

Lexington Insurance Company
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

Metropolitan Property and Casualty Insurance Company
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

National Fire & Marine Insurance Company
c/o Raj R. Mehta
1314 Douglas Street, Suite 1400
Omaha, NE 68102-1944

Ohio Security Insurance Company

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 5 of 148 PageID
#: 9

c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

Sentinel Insurance Company, Ltd.
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

Sompo America Insurance Company
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

Strathmore Insurance Company
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

The Charter Oak Fire Insurance Company
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

Travelers Casualty Insurance Company of America
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

Travelers Excess and Surplus Lines Company
One Tower Square
Hartford, CT 06183

Twin City Fire Insurance Company
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

United National Insurance Company
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

United Specialty Insurance Company

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 6 of 148 PageID #: 10

c/o National Registered Agents, Inc.
1209 Orange Street
Wilmington, DE 19801


Utica First Insurance Company
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

Western World Insurance Company
c/o Corporation Service Company
1201 Hays Street
Tallahassee, FL 32301-2525

XL Insurance America, Inc.
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

Zurich American Insurance Company
c/o New York State Department of Financial Services
One State Street
New York, New York 10004-1511

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 7 of 148 PageID #: 11

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

| | |
|---|---|
| ABRUZZO DOCG INC. d/b/a TARALLUCCI E VINO; AURIFY BRANDS, LLC; BIG DADDY'S II LLC d/b/a DUKE'S; BOQUERIA OPERATIONS, LLC; BRANDED RESTAURANT HOLDINGS, LLC; BROADWAY SRJ, LLC; CAPTAIN HADDOCK LLC; CITY WINERY LLC; ESS-A-BAGEL, INC. d/b/a ESS-A-BAGEL; ESS-A-BAGEL, 883 SIXTH AVENUE, LLC d/b/a ESS-A-BAGEL; FGNY PARENTCO, LLC; FOOD FOR JUNIOR'S INC.; FOURTH WALL RESTAURANTS, LLC d/b/a QUALITY BRANDED; FOX SRJ, LLC; GEORGE MARCEL LLC d/b/a FAIRFAX; GG CAMPBELL, LLC d/b/a THE CAMPBELL; GLOBAL DINING, INC. OF CALIFORNIA; GRAMERCY FARMER & THE FISH LLC d/b/a FARMER & THE FISH; GRAND CENTRAL OYSTER BAR INC. d/b/a GRAND CENTRAL OYSTER BAR; HAPPY COOKING LLC d/b/a JOSEPH LEONARD; HH BOWEN LLC d/b/a HARLEM HOOKAH; IL RIFUGIO INC. d/b/a TALLUCCI E VINO; JAVELINA TEX-MEX LLC d/b/a JAVELINA; LA VECCHIA LLC d/b/a TARALLUCCI E VINO; LE-SE AMSTERDAM 732 RESTAURANT, INC. d/b/a DIVE BAR; LITTLE WISCO LLC d/b/a FEDORA; MANNAGGIA INC. d/b/a TARALLUCCI E VINO; MF PEASANT, LLC d/b/a PEASANT RESTAURANT; MONOPOLIO LLC d/b/a TARALLUCCI E VINO; PENMANSHIP LLC d/b/a JEFFREY'S GROCERY; PHYSICAL ONION LLC d/b/a HARDWARE BAR; PIECES BAR LLC d/b/a PIECES BAR; RACINES NYC LLC; RAINBOW STARSHIP LLC d/b/a PLAYHOUSE BAR; RHLP 45 LLC; RHLP 284 LLC; SCHNIPPER RESTAURANTS, LLC; SEINFELD SQUARED LLC d/b/a DIVE BAR 106; ST. HELENE LLC d/b/a BAR SARDINE; STATE OF MIND HOLDINGS, LLC; STOUT, INC.; THREE HOOPLES, LTD. d/b/a BROADWAY DIVE BAR; TITO ROCKS LLC; UNION SQUARE HOSPITALITY GROUP LLC; 93 LUDLOW STREET INC. d/b/a THE DL AND DINNER ON LUDLOW; 101 WEST 75 BAR AND REST. ENTERPRISES, LTD. t/a BROADWAY DIVE BAR; 125 HOSPITALITY LLC d/b/a CAFE WHA?; 239 PARK AVENUE SOUTH ASSOCIATES LLC d/b/a BIG DADDY'S; 389 BROOME LLC d/b/a GOLDBAR; 560 THIRD AVENUE GROCERY CORP. d/b/a DUKE'S ORIGINAL ROADHOUSE; 643 BROADWAY HOLDINGS LLC d/b/a SWEETWATER SOCIAL; 1395 SECOND AVENUE RESTAURANT LLC d/b/a JAVELINA; 1626 SRJ, LLC, | Index No. |

*Plaintiffs,*

v.

ACCEPTANCE INDEMNITY INSURANCE COMPANY;  ADMIRAL INDEMNITY COMPANY; ARCH INSURANCE COMPANY;

[Caption continued on next page]

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 8 of 148 PageID #: 12

[Caption continued from previous page]

ASPEN AMERICAN INSURANCE COMPANY; AXIS INSURANCE
COMPANY; FIRST MERCURY INSURANCE COMPANY; GREENWICH
INSURANCE COMPANY; HARTFORD FIRE INSURANCE COMPANY;
HDI GLOBAL INSURANCE COMPANY; INDEMNITY INSURANCE
COMPANY OF NORTH AMERICA; LEXINGTON INSURANCE
COMPANY; METROPOLITAN PROPERTY AND CASUALTY
INSURANCE COMPANY; NATIONAL FIRE & MARINE INSURANCE
COMPANY; OHIO SECURITY INSURANCE COMPANY; SENTINEL
INSURANCE COMPANY LTD.; SOMPO AMERICA INSURANCE
COMPANY; STRATHMORE INSURANCE COMPANY; THE CHARTER
OAK FIRE INSURANCE COMPANY; TRAVELERS CASUALTY
INSURANCE COMPANY OF AMERICA; TRAVELERS EXCESS AND
SURPLUS LINES COMPANY; TWIN CITY FIRE INSURANCE COMPANY;
UNITED NATIONAL INSURANCE COMPANY; UNITED SPECIALTY
INSURANCE COMPANY; UTICA FIRST INSURANCE COMPANY;
WESTERN WORLD INSURANCE COMPANY; XL INSURANCE
AMERICA, INC.; ZURICH AMERICAN INSURANCE COMPANY,

*Defendants.*

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 9 of 148 PageID #: 13

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 17

PARTIES ........................................................................................................................... 17

I.     Plaintiffs ................................................................................................................ 17

II.    Defendants ............................................................................................................. 27

ADDITIONAL FACTUAL ALLEGATIONS ................................................................... 32

I.     The Shutdown and Partial Reopening Executive Orders ...................................... 32

II.    Direct Physical Loss or Damage ........................................................................... 36

       A.     Aurify Brands & FGNY ............................................................................. 36

       B.     Boqueria ..................................................................................................... 40

       C.     Branded Restaurants ................................................................................... 42

       D.     Cafe Wha? ................................................................................................... 45

       E.     The Campbell .............................................................................................. 46

       F.     City Winery ................................................................................................. 48

       G.     Dive Bars .................................................................................................... 51

       H.     The DL ........................................................................................................ 54

       I.     Ess-a-Bagel ................................................................................................. 56

       J.     Global Dining .............................................................................................. 58

       K.     Goldbar ....................................................................................................... 60

       L.     Grand Central Oyster Bar ........................................................................... 61

       M.     Happy Cooking Restaurants ....................................................................... 62

       N.     Harlem Hookah ........................................................................................... 65

       O.     Javelina ....................................................................................................... 67

       P.     Junior's ........................................................................................................ 69

i

Q.      Peasant ................................................................................................ 71

R.      Quality Branded ................................................................................ 73

S.      Racines NY ........................................................................................ 75

T.      Red Hook Lobster Pound ................................................................ 77

U.      Schnippers ......................................................................................... 80

V.      Stout .................................................................................................... 82

W.      Sweetwater Social ............................................................................ 85

X.      Tarallucci e Vino .............................................................................. 86

Y.      Tito Rocks Bars ................................................................................ 92

Z.      Union Square Hospitality Group .................................................. 94

CLAIMS FOR RELIEF ........................................................................................ 99

PRAYER FOR RELIEF ...................................................................................... 137

ii

The above-captioned Plaintiffs ("Plaintiffs")—a broad and diverse group of restaurants, bars, and other eating establishments—by and through their undersigned attorneys, hereby make this Complaint against the above-captioned Defendants ("Defendant Insurers") amidst the unprecedented circumstances of the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) ("coronavirus") pandemic, and allege as follows:

## INTRODUCTION

1.       Plaintiffs assert claims for business interruption insurance coverage under all-risk commercial property insurance policies ("Policies or Policy") issued and sold to each of them by their respective insurers.  Under longstanding and bedrock insurance law principles, Plaintiffs are entitled to payment under those policies for multi-million dollar business income losses and extra expenses incurred as a direct result of unprecedented state and municipal shutdown executive orders ("Shutdown Executive Orders") and restrictive Partial Reopening Executive Orders ("Partial Reopening Executive Orders") that caused physical loss or damage to their properties by requiring physical, detrimental alterations to them that rendered Plaintiffs' properties non-functional or only partially functional as restaurants or bars.

2.       Among the Plaintiffs are owners and operators of some of the most iconic and legendary restaurants, cafes, and bars in New York City.  Plaintiffs represent a diverse cross section of New York's restaurant and hospitality industry, from Junior's Cheesecake in Brooklyn to Ess-a-Bagel in Manhattan; from Red Hook Lobster Pound to Harlem Hookah; from Gramercy Tavern and Union Square Cafe to Schnippers and Five Guys; from Grand Central Oyster Bar and Smith & Wollensky steakhouse to Cafe Wha?; from Hardware Bar and Stout to Sweetwater Social and

1

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 12 of 148 PageID #: 16

The Campbell; from Tacocina and Duke's to Boqueria, Peasant, and many more. Tourists and New Yorkers alike flock to these venues for the best food and drink in the world. Together, Plaintiffs' establishments are the lifeblood of New York City and vital to its economy and culture.

3.    Prior to the Shutdown Executive Orders, Plaintiffs' establishments were bustling with activity. Their dining rooms, bars, and cafes were places where people sat to share a meal or drink; where families and friends gathered to celebrate special occasions; and where co-workers met for working or social lunches. Plaintiffs' properties were where New Yorkers came together and came to life, and tourists from around the globe came to visit. The physical premises of each establishment—including the layout, arrangement of seats and furniture, and flow of human traffic—were critical to the operation of each.

4.    The Shutdown Executive Orders ended all of that activity by rendering Plaintiffs' properties functionally inoperable. Beginning in mid-March 2020, the Governor of New York and the Mayor of New York City, like governors and mayors across the country, issued a series of unprecedented Shutdown and (later) Partial Reopening Executive Orders designed to prevent physical spaces from bringing people into close proximity with one another.[1]

5.    The restrictions imposed by the Shutdown Executive Orders detrimentally altered and directly and physically impaired Plaintiffs' properties. Dining rooms were physically blocked off or reconfigured as staging areas for take-out, delivery, or other drastically reduced services. Collectively, vast amounts of square footage in Plaintiffs' properties were rendered fully or partially nonfunctional for their intended purposes.

---

[1] For a detailed description of the Shutdown and Partial Reopening Executive Orders, *see infra* pp. 32-36.

2

6.      Due to the closure of dining spaces and social distancing requirements, the properties that remained open for the limited function of providing take-out or delivery service had to make significant, commercially detrimental alterations to their physical premises. They had to physically manipulate tables, chairs, and other equipment into less functional arrangements; install plexiglass or other makeshift barriers to prevent congregation; place markers on the floor or walls to indicate six-feet of separation; and redesign routes for entrance and exit. Once bustling, thoughtfully designed spaces were now physically limited to allow only for a line of customers, standing six feet apart (often on newly applied floor markers), waiting to pick up take-out orders.

7.      The Shutdown Executive Orders also directly and physically impaired the premises of eateries that are not centered upon indoor dining, such as pastry shops and fast-food restaurants that primarily provide to-go service. Due to the six-foot social distancing requirements, square footage ordinarily filled with customers waiting in line, purchasing food, or browsing display cases was physically restricted to one customer for every six feet of space. In addition, many of these properties erected plexiglass barriers, affixed markers, and made other detrimental physical modifications to their premises as a result of the Shutdown Executive Orders' social distancing restrictions.

8.      For example, in order to offer take-out and delivery following the Shutdown Executive Orders, Plaintiff Food for Junior's Inc., which owns and operates Junior's iconic flagship location in Brooklyn, had to install plexiglass barriers at its cashier stations and across its glass cases to separate customers and employees safely. The restaurant has also moved tables, affixed social distancing markers to its floors, posted social distancing signs, and redesigned traffic

through its entrances and exits. These physical restrictions, shown below, have impaired and restricted the restaurant's functioning, physically limited the number of patrons served, and thus reduced its revenues significantly.

 

9.      As another example, Plaintiff Schnipper Restaurants, LLC ("Schnippers") was required to make detrimental material alterations to the premises of its two locations offering take-out and delivery, including by removing tables and blocking off seating areas to prevent customers from dining in (see below), by installing plexiglass dividers where customers place orders, and by affixing social distancing decals to the floor.

4

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 15 of 148 PageID #: 19



10.     In addition, Plaintiff Le-Se Amsterdam 732 Restaurant, Inc., the owner and operator of Dive Bar, an Upper West Side institution for over thirty years, created a makeshift "to-go" station at its main front window by clearing the tables and chairs in front of the window and using them as a physical barrier to separate patrons and employees, and by adding a narrow table as a counter for take-out service, as shown below.  The indoor premises of Dive Bar otherwise remains physically non-functional.

5

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 16 of 148 PageID #: 20



11.    Many other establishments operated by Plaintiffs closed their doors altogether during the period covered by the Shutdown Executive Orders, as the severity of the physical restrictions made it impossible to continue to function at all.

12.    Even as New York City and State officials have begun a phased reopening of the restaurant and hospitality industry, significant physical restrictions on Plaintiffs' premises persist in the Partial Reopening Executive Orders.  For instance, as of June 22, 2020, *outdoor* on-premises dining was permitted to resume in New York City, but all indoor dining and seating areas remain closed to the public. To compensate for the lost indoor square footage occasioned by his earlier order, Governor Cuomo permitted restaurants and bars "to use (a) contiguous public space (for example, sidewalks or closed streets) and/or (b) otherwise unlicensed contiguous private space under the control of such restaurant or bar" for outdoor dining purposes, subject to certain limitations. (NY Executive Order No. 202.38.)  Restaurants reopening for outdoor dining service must make a number of detrimental physical changes to their outdoor spaces, including (i) moving

6

each table at least six feet away from any other table, patron, or pedestrian thoroughfare, or erecting physical barriers where distancing is infeasible; (ii) physically demarcating six feet of spacing in any customer lines; and (iii) providing physically separate entrances and exits for customers and employees, where possible.[2]

13.    For example, Plaintiff RHLP 284 LLC, which owns and operates Red Hook Lobster Pound in Brooklyn, originally offered seating at its outdoor cafe for sixteen customers, but now can seat only eight.  To supplement this seating, and its complete loss of indoor seating, the Red Hook Lobster Pound constructed a new seating area utilizing space from the parking areas in front of the restaurant.  Using flower-filled coolers, concrete buckets with posts, and red rope to separate the new seating area from the street, this additional seating area permits Red Hook Lobster Pound to seat another 18 patrons, for a total of 26 seats, significantly reduced from its 86-seat total capacity prior to the Shutdown and Partial Reopening Executive Orders.  The following marked-up floor plans of the indoor and outdoor dining space changes at Red Hook Lobster Pound are illustrative of the direct physical impairment that the Shutdown and Partial Reopening Executive Orders caused to Plaintiffs' properties.

---

[2] New York Executive Order No. 202.38 requires that all bars and restaurants open for outdoor dining must do so "in compliance with Department of Health guidance promulgated for such activity."  *See also* "Reopening New York:  Outdoor and Takeout/Delivery Food Services Guidelines for Employers and Employees," https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/OutdoorTakeoutDeliveryFoodServic esSummaryGuidance.pdf.

7

*Red Hook Lobster Pound Indoor Floorplan*



*Red Hook Lobster Pound Outdoor Floorplan*



8

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 19 of 148 PageID
#: 23

14.     As another example, prior to the Shutdown Executive Orders, Plaintiff 93 Ludlow Street Inc. d/b/a The DL and Dinner on Ludlow ("The DL"), a bar, restaurant, and nightclub in Manhattan's Lower East Side, had three open floors spanning 7,500 square-feet, including a spacious open-concept rooftop allowing bar-goers to spread out across the roof.   Even after reopening for outdoor dining, the first two floors remain closed, and The DL has had to fill its open rooftop space with tables and barriers to ensure it meets social distancing requirements, and block off open spaces and seating where guests previously socialized, as shown below.  In all, the Rooftop's capacity has been cut in half, and The DL's total capacity is now less than what its first floor restaurant held prior to the Shutdown Executive Orders.  As a direct result of the Shutdown and Partial Reopening Executive Orders, The DL has been physically transformed from a bustling three-story nightclub to a carefully spaced one-floor restaurant.

 

9

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 20 of 148 PageID #: 24

15.     City Vineyard, a winery, restaurant, and event space on Pier 26 in Hudson River Park owned and operated by Plaintiff City Winery LLC, also had to make several detrimental material alterations to reopen for outdoor dining.  For instance, as shown in the floorplans below, City Vineyard has cut the number of tables in its outdoor garden by more than half (from 40 to 19) to accommodate social distancing restrictions.

*Garden Floorplan Prior to Shutdown and Partial Reopening Executive Orders (Cont. Below)*



10

FILED: KINGS COUNTY CLERK 08/04/2020 10:03 AM
INDEX NO. 514089/2020
NYSCEF DOC. NO. 1
Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 21 of 148 PageID
#: 25
RECEIVED NYSCEF: 08/04/2020



*Garden Floorplan After Shutdown and Partial Reopening Executive Orders*



11

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 22 of 148 PageID #: 26

16. In addition, Plaintiff Union Square Hospitality Group LLC ("USHG"), which owns and operates Tacocina, a taqueria in Williamsburg, Brooklyn, among many other iconic New York City restaurants, installed social distancing markers, moved pickup stations to be at least six feet apart, and can now only offer six standing tables outside for outdoor dining, as shown below. Whereas prior to the Shutdown and Partial Reopening Executive Orders, their space accommodated over 100 people for outdoor dining, now, as a direct result of the Partial Reopening Executive Orders, their reconfigured space can accommodate only 30 to 40 at the standing tables. USHG has had to make similar detrimental material alterations at storied restaurants like Union Square Cafe that have reopened for outdoor dining.

*Tacocina*

 

17. The extraordinary set of physical limitations and requirements that the Shutdown and Partial Reopening Executive Orders imposed, and continue to impose, on Plaintiffs' establishments caused Plaintiffs to suffer unprecedented economic losses, including millions of dollars in lost income and wasted and extra business expenses. Their properties were carefully designed and configured to maximize food and beverage service on premises. Thus, the physical

12

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 23 of 148 PageID #: 27

loss and impairment of Plaintiffs' spaces for these core functions have caused Plaintiffs to lose hundreds of millions of dollars.

### *Plaintiffs' All-Risk Insurance Policies and Defendants' Denial of Plaintiffs' Claims*

18.    Plaintiffs turned to Defendant Insurers, reasonably expecting that they would cover Plaintiffs' mounting losses that directly resulted from the Shutdown and Partial Reopening Executive Orders. To insure against losses from unexpected and unprecedented circumstances like these, Plaintiffs had purchased business interruption coverage as part of all-risk commercial property insurance policies. As Defendant Insurers are well aware, "all-risk" commercial property policies cover all risks of any kind or description, unless specifically excluded. Unlike "enumerated perils" property insurance, which covers only specified causes of loss, all-risk property insurance covers even unprecedented and unanticipated risks of loss, thereby providing consumers with comfort that all possible risks of loss are covered, unless specifically excluded. Due to the breadth of coverage, Plaintiffs paid a substantial premium for this type of insurance. Here, the Shutdown and Partial Reopening Executive Orders are clearly within the scope of risks covered by the Policies.

19.    The business interruption coverage in Plaintiffs' Policies (also known as "Time Element" coverage) insures against the loss of business income and extra expense incurred as a result of "direct physical loss of or damage to" insured property from a covered risk.[3]

20.    Thus, when the Shutdown and Partial Reopening Executive Orders rendered their properties essentially non-functional for months by requiring physical changes and restrictions to

---

[3] Certain policies use different variations of these same terms, *e.g.*, "direct physical loss or damage to."

13

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 24 of 148 PageID #: 28

their properties as described above, Plaintiffs reasonably expected that the Shutdown and Partial Reopening Executive Orders were among all the risks against which they were insured. Accordingly, each Plaintiff gave timely notice of a claim for business interruption coverage under its respective Policy.

21.     Plaintiffs' claims have been actually or constructively denied.  On information and belief, insurers have taken a nearly blanket approach of issuing denials to policyholders claiming losses caused by the Shutdown and Partial Reopening Executive Orders.  The denials are based on the wholly incorrect contention that Plaintiffs' claims did not result from "direct physical loss of" or "damage to" insured property, as required by their Policies.

22.     Thus, each Plaintiff comes to this Court with a common threshold legal question: whether Defendant Insurers must provide coverage under all-risk commercial property insurance Policies for direct physical loss or damage caused by unprecedented executive orders which have seriously and physically impaired, detrimentally altered, and rendered Plaintiffs' properties physically non-functional in whole or in part.

### *The Shutdown and Partial Reopening Executive Orders Caused "Direct Physical Loss of" or "Damage to" Plaintiffs' Properties*

23.     The crux of Defendant Insurers' position is that Plaintiffs did not sustain "direct physical loss of" or "damage to" property within the meaning of the Policies because no property was physically destroyed or disfigured.  But there is no language in any of the Policies requiring this narrow construction. Under any reasonable interpretation, the terms "direct physical loss of" or "damage to" property are much broader and would include detrimental physical effects, like those caused by the Shutdown and Partial Reopening Executive Orders, which altered, and

14

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 25 of 148 PageID #: 29

impaired the functioning of, the tangible, material dimensions of Plaintiffs' property. This is especially true where, as here, property has been rendered partially or wholly nonfunctional for its intended purpose due to the altered appearance, shape, and other material aspects of the property.

24.     Defendant Insurers chose not to define the terms "direct physical loss" or "damage" in the Policies, nor did they define "direct physical damage" or "physical damage." Instead, Defendant Insurers intentionally left each of these terms undefined—even though they knew, or should have known, that these terms can reasonably be construed, and indeed have been construed by courts, more broadly than the narrow self-serving definition that they contend should provide the terms' only meaning. As undefined terms in the Policies, each of the terms at issue here must be given its plain and ordinary meaning consistent with the knowledge and expectations of an ordinary, reasonable consumer.

25.     In the Policies, "loss" is used in the alternative to "damage." Thus, there is coverage provided for both "loss" and "damage," either alternatively or collectively, because "loss" coverage is different from, and is in addition to, "damage" coverage. Property "loss" refers to, among other things, being deprived of a property's function, while "damage" refers to, among other things, the impairment of property or a reduction in its functionality. The adjective "physical," among other things, distinguishes between the tangible, material aspects of an object and those that are purely intangible, such as sentiment, emotion, or imagination. In addition, under a plain grammatical reading of the phrase "direct physical loss of or damage to" property (or "direct physical loss or damage to" property), the words "direct" and "physical" can be reasonably construed as modifying only "loss" coverage—not "damage" coverage. To the extent that any

15

language in the Policies is ambiguous, standard canons of construction provide that it should be construed against Defendant Insurers as drafters and in favor of coverage.

26.     Whether considered independently or together, moreover, the terms "loss" and "damage" both point in the same direction here: the Shutdown and Partial Reopening Executive Orders caused both property loss and property damage by directly, physically, and seriously impairing the functionality of Plaintiffs' property and dispossessing Plaintiffs of their tangible spaces.  Dining rooms closed or limited, areas blocked off, barriers erected, appearances altered, furniture moved, fixtures altered, spaces shuttered, floors marked, plexiglass mounted—these are but a few of the physical manifestations of that direct physical loss and damage Plaintiffs' properties have incurred.

27.     Each of the Plaintiffs understood, expected, and believed that their Policies would cover the circumstances presented here. This understanding and expectation is both subjectively and objectively reasonable.  Defendant Insurers cannot now redefine or narrow the meaning of physical loss or damage—or any other undefined terms in the Policies—to support a denial of coverage in these unprecedented circumstances. Yet that is exactly what they have done.

28.     Because there is a reasonable construction of these terms that provides coverage to Plaintiffs for their business interruption claims—and based on bedrock insurance law principles requiring policy terms to be construed broadly in favor of coverage for Plaintiffs—Defendant Insurers must pay Plaintiffs' claims.

29.     Accordingly, Plaintiffs seek a declaratory judgment that the Shutdown and Partial Reopening Executive Orders caused direct physical loss of or damage to their insured properties.

16

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 27 of 148 PageID #: 31

Plaintiffs also bring breach of contract claims for Defendant Insurers' failure to indemnify Plaintiffs for the losses sustained as a direct result of the Shutdown and Partial Reopening Executive Orders. Plaintiffs further assert their full entitlement to coverage under all applicable Policy provisions, independently or alternatively as appropriate, including but not limited to all relevant extensions of coverage. Plaintiffs do not waive any claims for Defendant Insurers' wrongful denials of coverage for the substantial losses Plaintiffs have incurred, the full amount of which will be proven at trial.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over Defendant Insurers pursuant to CPLR §§ 301, 302, as several Defendant Insurers are incorporated, or have their principal place of business, in New York, and the remaining out-of-state Defendant Insurers have contracted to supply insurance products and services in New York.

31.     Venue in Kings County is proper pursuant to CPLR § 503, as several parties currently reside in this county and a substantial part of the events or omissions giving rise to claims occurred here.

## PARTIES

I.      **Plaintiffs**

32.     Plaintiff Abruzzo Docg Inc. d/b/a Tarallucci e Vino ("Tarallucci e Vino Union Square") is a New York corporation with a principal place of business in New York, NY. Tarallucci e Vino Union Square owns and operates an Italian restaurant, located at 15 East 18th

17

Street, New York, NY, and event venue, located inside of the same building but with a different entrance at 873 Broadway, New York, New York.

33.     Plaintiff Aurify Brands, LLC ("Aurify Brands") is a New York limited liability company with a principal place of business in New York, NY.  Aurify Brands operates several popular chains and national fast casual franchises in and around New York City, including Melt Shop, Five Guys, Fields Good Chicken, The Little Beet, and Little Beet Table.

34.     Plaintiff Boqueria Operations, LLC ("Boqueria") is a New York limited liability company with a principal place of business in New York, NY.  Plaintiff State of Mind Holdings, LLC is a Delaware limited liability company with a principal place of business in New York, NY. Together, Boqueria Operations, LLC and State of Mind Holdings, LLC (collectively, "Boqueria") own and operate seven Spanish tapas bars and restaurants in New York City, Washington, D.C., and Chicago.

35.     Plaintiff Branded Restaurant Holdings, LLC ("Branded") is a Delaware limited liability company with a principal place of business in New York, NY.  Branded and the four following companies own and operate four restaurants in New York City:  Plaintiff 560 Third Avenue Grocery Corp. d/b/a Duke's Original Roadhouse, located at 560 Third Avenue, New York, NY 10016 ("Duke's"); Plaintiff Big Daddy's II LLC d/b/a Duke's, a second Duke's location located at 1596 Second Avenue, New York, NY 10028 ("Duke's UES"); Plaintiff 239 Park Avenue South Associates LLC d/b/a Big Daddy's, located at 239 Park Avenue South, New York, NY 10003 ("Big Daddy's"); and Plaintiff Gramercy Farmer & the Fish LLC d/b/a Farmer & the Fish, located at 245 Park Avenue South, New York, NY 10003 ("Farmer & the Fish") (collectively,

18

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 29 of 148 PageID #: 33

the "Branded Restaurants"). Duke's, Duke's UES, Big Daddy's, and Farmer & the Fish are New York limited liability companies, each with a principal place of business in New York, NY.

36.     Plaintiff Broadway SRJ, LLC is a New York limited liability company with a principal place of business in Brooklyn, NY. Broadway SRJ, LLC owns and operates a Junior's restaurant located at 1515 Broadway, New York, NY 10019 ("Junior's Theater District"). Broadway SRJ, LLC and Junior's Theater District are referred to simply as "Junior's Theater District" for ease of reference.

37.     Plaintiff Captain Haddock LLC is a Delaware limited liability company with a principal place of business in New York, NY. Captain Haddock LLC owns and operates five restaurants: The Jones, located at 54 Great Jones Street, New York, NY 10012, and three restaurants in the Freehand Hotel—Simon & the Whale, Studio, and George Washington Bar— located at 23 Lexington Avenue, New York, NY 10010. Captain Haddock LLC, along with Plaintiffs Happy Cooking LLC, Little Wisco LLC, Penmanship LLC, St. Helene LLC, and George Marcel LLC, are part of Happy Cooking Hospitality ("Happy Cooking").

38.     Plaintiff City Winery LLC ("City Winery") is a Delaware limited liability company with a principal place of business in New York, NY. City Winery operates twelve high-end restaurants across the country, including in New York, Chicago, and Boston.

39.     Plaintiff Ess-a-Bagel, Inc. d/b/a Ess-a-Bagel ("Ess-a-Bagel East") is a New York corporation with a principal place of business in New York, NY. Ess-a-Bagel East owns and operates a bagel and sandwich shop located at 831 3rd Avenue, New York, NY 10022.

19

40.     Plaintiff Ess-a-Bagel, 883 Sixth Avenue, LLC d/b/a Ess-a-Bagel ("Ess-a-Bagel West") is a New York limited liability company with a principal place of business in New York, NY.  Ess-a-Bagel West owns and operates a bagel and sandwich shop located at 108 West 32nd Street, New York, NY 10001.

41.     Plaintiff FGNY ParentCo, LLC ("FGNY") is a Delaware limited liability company with a principal place of business in New York, NY.  FGNY currently owns 14 Five Guys locations in and around New York City, which are operated by Plaintiff Aurify Brands.

42.     Plaintiff Food for Junior's Inc. is a New York corporation with a principal place of business in Brooklyn, NY.  Food for Junior's Inc. owns and operates the flagship Junior's restaurant located at 386 Flatbush Avenue EXT, Brooklyn, NY 11201 ("Junior's Brooklyn"). Food for Junior's Inc. and Junior's Brooklyn are referred to simply as "Junior's Brooklyn" for ease of reference.

43.     Plaintiff Fourth Wall Restaurants, LLC d/b/a Quality Branded ("Quality Branded") is a New York limited liability company with a principal place of business in New York, NY. Quality Branded operates 12 upscale restaurants in New York City, Denver, and Miami, including Smith & Wollensky, Quality Eats, Quality Meats, and Don Angie.

44.     Plaintiff Fox SRJ, LLC is a Connecticut limited liability company with a principal place of business in Brooklyn, NY.  Fox SRJ, LLC owns and operates owns and operates a Junior's restaurant located at 240 Fox Tower Drive, Mashantucket, CT 06338 ("Junior's Connecticut"). Fox SRJ, LLC and Junior's Connecticut are referred to simply as "Junior's Connecticut" for ease of reference.

20

45.     Plaintiff George Marcel LLC d/b/a Fairfax ("Fairfax"), part of Happy Cooking, is a New York limited liability company, with a principal place of business in New York, NY. Fairfax operates a restaurant of the same name located at 234 West 4th Street, New York, NY 10014.

46.     Plaintiff GG Campbell, LLC d/b/a The Campbell ("The Campbell") is a Delaware limited liability company with a principal place of business in New York, NY.  The Campbell is a landmark bar and lounge located in historic Grand Central Terminal at 15 Vanderbilt Avenue, New York, 10017.

47.     Plaintiff Global Dining, Inc. of California ("Global Dining") is a California corporation with a principal place of business in Santa Monica, CA.  Global Dining owns and operates two upscale restaurants in Los Angeles and Santa Monica, LA.

48.     Plaintiff Grand Central Oyster Bar Inc. d/b/a Grand Central Oyster Bar ("Grand Central Oyster Bar") is a New York corporation with a principal place of business in New York, NY.  Grand Central Oyster Bar is a landmark Manhattan restaurant that sits within Grand Central Terminal, located at 89 East 42nd Street, New York, NY 10017.

49.     Plaintiff Happy Cooking LLC d/b/a Joseph Leonard ("Joseph Leonard") is a New York limited liability company with a principal place of business in New York, NY.  Joseph Leonard operates a restaurant of the same name at 170 Waverly Place, New York, NY 10014.

50.     Plaintiff HH Bowen LLC d/b/a Harlem Hookah ("Harlem Hookah") is a New York limited liability company with a principal place of business in New York, NY.  Harlem Hookah owns and operates an upscale hookah lounge of the same name in Manhattan, NY.

21

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 32 of 148 PageID #: 36

51.     Plaintiff Il Rifugio Inc. d/b/a Tallucci E Vino ("Tallucci E Vino Upper West Side") is a New York corporation with a principal place of business in New York, NY. Tarallucci e Vino Upper West Side owns and operates an Italian restaurant, located at 475 Columbus Avenue, New York, NY.

52.     Plaintiff Javelina Tex-Mex LLC d/b/a Javelina ("Javelina Union Square") is a New York limited liability company with a principal place of business in New York, NY. Javelina Union Square operates an authentic Tex Mex restaurant located at 119 E 18th Street, New York, NY 10003.

53.     Plaintiff La Vecchia LLC d/b/a Tarallucci e Vino ("Tarallucci e Vino Nomad") is a New York limited liability company with a principal place of business in New York, NY. Tarallucci e Vino Nomad owns and operates an Italian restaurant located at 44 East 28th Street, New York, NY.

54.     Plaintiff Le-Se Amsterdam 732 Restaurant, Inc. d/b/a Dive Bar ("Dive Bar") is incorporated in New York with a principal place of business in New York, NY. Dive Bar is a neighborhood bar located at 732 Amsterdam Avenue, New York, NY 10025.

55.     Plaintiff Little Wisco LLC d/b/a Fedora ("Fedora"), part of Happy Cooking, is a New York limited liability company, with a principal place of business in New York, NY. Fedora operates a restaurant of the same name located at 239 West 4th Street, New York, NY 10014.

56.     Plaintiff Mannaggia Inc. d/b/a Tarallucci e Vino ("Tarallucci e Vino East Village") is a New York corporation with a principal place of business in New York, NY. Tarallucci e Vino East Village owns and operates an Italian restaurant, located at 163 First Avenue, New York, NY.

22

57.     Plaintiff MF Peasant, LLC d/b/a Peasant Restaurant ("Peasant") is a New York limited liability company with a principal place of business in New York, NY. Peasant is a beloved Italian restaurant located at 194 Elizabeth Street, New York, NY 10012.

58.     Plaintiff Monopolio LLC d/b/a Tarallucci e Vino ("Tarallucci e Vino Cooper Hewitt") is a New York limited liability company with a principal place of business in New York, NY. Tarallucci e Vino Cooper Hewitt owns and operates an Italian cafe and event venue, located inside the Cooper Hewitt Smithsonian Design Museum at 9 East 90th Street, New York, NY.

59.     Plaintiff Penmanship LLC d/b/a Jeffrey's Grocery ("Jeffrey's Grocery"), part of Happy Cooking, is a New York limited liability company, with a principal place of business in New York, NY. Jeffrey's Grocery operates a restaurant of the same name located at 172 Waverly Place, New York, NY 10014.

60.     Plaintiff Racines NYC LLC ("Racines NY") is a New York limited liability company with a principal place of business in New York, NY. Racines NY owns and operates a wine restaurant of the same name located at 94 Chambers Street, New York, NY 10007.

61.     Plaintiff RHLP 45 LLC is a New York limited liability company, with a principal place of business in Brooklyn, NY. RHLP 45 LLC operates the Red Hook Lobster Pound location at the Urbanspace Vanderbilt food hall ("Red Hook Lobster Pound Vanderbilt"), located at 230 Park Avenue, New York, NY. RHLP 45 LLC and Red Hook Lobster Pound Vanderbilt are referred to simply as "Red Hook Lobster Pound Vanderbilt" for ease of reference.

62.     Plaintiff RHLP 284 LLC is a New York limited liability company with a principal place of business in Brooklyn, NY. RHLP 284 LLC owns and operates the nautically-themed

23

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 34 of 148 PageID #: 38

restaurant, Red Hook Lobster Pound, located at 284 Van Brunt Street, Brooklyn, NY 11231. RHLP 284 LLC and Red Hook Lobster Pound are referred to simply as "Red Hook Lobster Pound" for ease of reference.

63.     Plaintiff Schnipper Restaurants, LLC ("Schnippers") is a New York limited liability company with a principal place of business in New York, NY.  As a successful and popular family-owned chain restaurant business, Schnippers operates four eat-in lunch and dinner restaurant locations in the borough of Manhattan: one near the World Trade Center, located at 120 Church St., New York, NY 10007 ( "Schnippers Tribeca"); one near Times Square, located at 620 8th Ave., New York, NY 10018 ("Schnippers Times Square"); one in Midtown, located at 570 Lexington Ave., New York, NY 10022 ("Schnippers Midtown"); and one named Thunder Bun, a Schnipper Bros. Eatery, in the Financial District, located at 1 New York Plaza, FDR Dr., New York, NY 10004 ("Schnippers FiDi").

64.     Plaintiff Seinfeld Squared LLC d/b/a Dive Bar 106 ("Dive 106") is a New York limited liability company with a principal place of business in New York, NY.  Dive 106 is a neighborhood bar located at 938 Amsterdam Avenue, New York, NY 10025.

65.     Plaintiff St. Helene LLC d/b/a bar Sardine ("bar Sardine"), part of Happy Cooking, is a New York limited liability company, with a principal place of business in New York, NY.  bar Sardine operates a restaurant of the same name located at 183 West 10th Street, New York, NY 10014.

24

66.    Plaintiff Stout, Inc. (hereinafter "Stout NYC Hospitality Group") is a New York corporation with a principal place of business in New York, NY. Stout NYC Hospitality Group owns and operates twelve American bars and restaurants throughout New York City.

67.    Plaintiff Three Hooples, Ltd. d/b/a Dive Bar ("Broadway Dive") is incorporated in New York with a principal place of business in New York, NY. Broadway Dive is a neighborhood bar located at 2662 Broadway, New York, NY 10025.

68.    Plaintiff Tito Rocks LLC ("Tito Rocks") is a New York limited liability company, with a principal place of business in New York, NY. Tito Rocks, through its subsidiary LLCs, owns and operates three popular gay bars in New York City: Plaintiff Pieces Bar LLC d/b/a Pieces Bar, located at 8 Christopher Street, New York, NY 10014 ("Pieces Bar"); Plaintiff Physical Onion LLC d/b/a Hardware Bar, located at 697 10th Avenue, New York, NY 10036 ("Hardware Bar"); and Plaintiff Rainbow Starship LLC d/b/a Playhouse Bar, located at 100A 7th Avenue South, New York, NY 10014 ("Playhouse Bar"). Pieces Bar, Hardware Bar, and Playhouse Bar are each a New York limited liability company with a principal place of business in New York, NY.

69.    Plaintiff Union Square Hospitality Group LLC ("USHG") is a New York limited liability company with a principal place of business in New York, NY. USHG operates over 20 well-known restaurants, bars, cafes, and other venues in New York City and Washington, D.C., among other places, including Union Square Cafe, Gramercy Tavern, The Modern, and Tacocina.

70.    Plaintiff 93 Ludlow Street Inc. d/b/a The DL and Dinner on Ludlow ("The DL") is a New York corporation with a principal place of business in New York, NY. The DL operates a

25

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 36 of 148 PageID #: 40

popular and spacious three-story nightclub, bar, and restaurant located at 95 Delancey Street, New York, NY 10002.

71. Plaintiff 101 West 75 Bar and Rest. Enterprises, Ltd. t/a Dive Bar 75 ("Dive 75") is incorporated in New York with a principal place of business in New York, NY. Dive Bar 75 is a neighborhood bar located at 101 West 75th Street, New York, NY 10023.

72. Plaintiff 125 Hospitality LLC d/b/a Cafe Wha? ("Cafe Wha?") is a New York limited liability company with a principal place of business in New York, NY. Cafe Wha? owns and operates a live music venue and restaurant, located at 115 MacDougal Street, New York, NY 10012.

73. Plaintiff 389 Broome LLC d/b/a Goldbar ("Goldbar") is a New York limited liability company with a principal place of business in New York, NY. Goldbar is a popular and extravagant restaurant, bar, and nightlife lounge located at 389 Broome Street, New York, NY 10013.

74. Plaintiff 643 Broadway Holdings LLC d/b/a Sweetwater Social ("Sweetwater Social") is a New York limited liability company with a principal place of business in New York, NY. Sweetwater Social owns and operates a subterranean cocktail lounge of the same name located at 643 Broadway, New York, NY 10012.

75. Plaintiff 1395 Second Avenue Restaurant LLC d/b/a Javelina ("Javelina Upper East Side") is a New York limited liability company with a principal place of business in New York, NY. Javelina Upper East Side operates an authentic Tex Mex restaurant located at 1395 Second Avenue, New York, NY 10021.

26

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 37 of 148 PageID
#: 41

76.     Plaintiff 1626 SRJ, LLC is a New York limited liability company with a principal

place of business in Brooklyn, NY. 1626 SRJ, LLC owns and operates a Junior's restaurant located

at 1626 Broadway, New York, NY 10019 ("Junior's Times Square"). 11626 SRJ, LLC and

Junior's Times Square are referred to simply as "Junior's Times Square" for ease of reference.

**II.    Defendants**

77.     The following is stated on information and belief.

78.     Defendant Acceptance Indemnity Insurance Company ("Acceptance Indemnity")

is a property and casualty insurance provider incorporated in Nebraska with a principal place of

business in Raleigh, NC. Acceptance Indemnity provides insurance products and services

throughout the United States, including in New York.

79.     Defendant Admiral Indemnity Company ("Admiral") is a property and casualty

insurance provider incorporated in Delaware, with a principal place of business in Rutherford, NJ.

Admiral provides insurance products and services throughout the United States, including in New

York.

80.     Defendant Arch Insurance Company ("Arch Insurance") is a property, casualty, and

specialty insurance provider incorporated in Missouri, with a principal place of business in Kansas,

City, MO. Arch Insurance provides insurance products and services throughout the United States,

including in New York.

81.     Defendant Aspen American Insurance Company ("Aspen American") is a property

and casualty insurance provider incorporated in Texas, with a principal place of business in Rocky

27

Hill, CT. Aspen American provides insurance products and services worldwide, including in New York.

82.    Defendant AXIS Insurance Company ("AXIS") is a property and casualty insurance provider headquartered in Illinois, with a principal place of business in Alpharetta, GA. AXIS provides insurance products and services throughout the United States, including in New York.

83.    Defendant First Mercury Insurance Company ("First Mercury") is a property and casualty insurance provider incorporated in Delaware, with a principal place of business in Southfield, MI. First Mercury provides insurance products and services throughout the United States, including in New York.

84.    Defendant Greenwich Insurance Company ("Greenwich") is a property and casualty insurance provider incorporated in Delaware, with a principal place of business in Stamford, CT. Greenwich provides insurance products and services throughout the United States, including in New York.

85.    Defendant Hartford Fire Insurance Company ("Hartford") is a property and casualty insurance provider incorporated in Connecticut, with a principal place of business in Hartford, CT. Hartford provides insurance products and services throughout the United States, including in New York.

86.    Defendant HDI Global Insurance Company ("HDI Global") is a property and casualty insurance provider incorporated in Illinois, with a principal place of business in Chicago, IL. HDI Global provides insurance products and services worldwide, including in New York.

28

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 39 of 148 PageID #: 43

87.     Defendant Indemnity Insurance Company of North America ("Indemnity Insurance") is a property and casualty insurance provider incorporated in Pennsylvania, with a principal place of business in Philadelphia, PA.  Indemnity Insurance provides insurance products and services throughout the United States, including in New York.

88.     Defendant Lexington Insurance Company ("Lexington") is a property, casualty, and specialty lines insurance provider incorporated in Delaware, with a principal place of business in Boston, MA.  Lexington provides insurance products and services worldwide, including in New York.

89.     Defendant Metropolitan Property and Casualty Insurance Company ("MetLife") is a property and casualty insurance provider incorporated in Rhode Island, with a principal place of business in Warwick, RI.  MetLife provides insurance products and services worldwide, including in New York.

90.     Defendant National Fire & Marine Insurance Company ("National Fire") is a property and casualty insurance provider incorporated in Nebraska, with a principal place of business in Omaha, NE.  National Fire provides insurance products and services throughout the United States, including in New York.

91.     Defendant Ohio Security Insurance Company ("Ohio Security") is a property and casualty insurance provider incorporated in New Hampshire, with a principal place of business in Boston, MA.  Ohio Security provides insurance products and services throughout the United States, including in New York.

29

92. Defendant Sentinel Insurance Company Ltd. ("Sentinel") is a property and casualty insurance provider incorporated in Connecticut, with a principal place of business in Hartford, CT. Sentinel provides insurance products and services throughout the United States, including in New York.

93. Defendant Sompo America Insurance Company ("Sompo America") is a property and casualty insurance provider incorporated in New York, with a principal place of business in Charlotte, NC. Sompo America provides insurance products and services throughout the United States, including in New York.

94. Defendant Strathmore Insurance Company ("Strathmore") is a property and casualty insurance provider incorporated in New York, with a principal place of business in New York, NY. Strathmore provides insurance products and services throughout the United States, including in New York.

95. Defendant The Charter Oak Fire Insurance Company ("Charter Oak") is a property and casualty insurance provider incorporated in Connecticut, with a principal place of business in Hartford, CT. Charter Oak provides insurance products and services throughout the United States, including in New York.

96. Defendant Travelers Casualty Insurance Company of America ("Travelers Casualty") is a property and casualty insurance provider incorporated in Connecticut, with a principal place of business in Hartford, CT. Travelers Casualty provides insurance products and services throughout the United States, including in New York.

30

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 41 of 148 PageID #: 45

97.     Defendant Travelers Excess and Surplus Lines Company ("Travelers Excess") is a property and casualty insurance provider incorporated in Connecticut, with a principal place of business in Hartford, CT.  Travelers Excess provides insurance products and services throughout the United States, including in New York.

98.     Defendant Twin City Fire Insurance Company ("Twin City") is a property and casualty insurance provider incorporated in Indiana, with a principal place of business in Indianapolis, IN.  Twin City provides insurance products and services throughout the United States, including in New York.

99.     Defendant United National Insurance Company ("United National") is a property and casualty insurance provider incorporated in Pennsylvania, with a principal place of business in Bala Cynwyd, PA.  United National provides insurance products and services throughout the United States, including in New York.

100.    Defendant United Specialty Insurance Company ("United Specialty") is a property and casualty insurance provider incorporated in Delaware, with a principal place of business in Bedford, TX.  United Specialty provides insurance products and services throughout the United States, including in New York.

101.    Defendant Utica First Insurance Company ("Utica First") is a regional property and casualty insurance provider incorporated in New York, with a principal place of business in Oriskany, NY.  Utica First provides insurance products and services in Connecticut, Florida, Maryland, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, and Virginia.

31

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 42 of 148 PageID #: 46

102.    Defendant Western World Insurance Company ("Western World") is a property and casualty insurance provider incorporated in New Hampshire, with a principal place of business in Parsippany, NJ. Western World offers insurance products and services throughout the United States, including in New York.

103.    Defendant XL Insurance America, Inc. ("XL Insurance") is a property and casualty insurance provider incorporated in Delaware, with a principal place of business in Stamford, CT. XL Insurance provides insurance products and services throughout the United States, including in New York.

104.    Defendant Zurich American Insurance Company ("Zurich") is a property and casualty insurance provider incorporated in New York, with a principal place of business in Schaumberg, Illinois. Zurich provides insurance products and services throughout the United States, including in New York.

## ADDITIONAL FACTUAL ALLEGATIONS

**I.      The Shutdown and Partial Reopening Executive Orders**

105.    In mid-March 2020, governors and mayors across the country issued a series of unprecedented Shutdown Executive Orders.

106.    In New York, Governor Andrew M. Cuomo began issuing a series of Shutdown Executive Orders, shortly after declaring a state disaster emergency on March 7, 2020. Initially, Governor Cuomo ordered that all places of business or public accommodation operate at no greater than 50% occupancy and no greater than 50% of seating capacity, effective March 13. (NY Executive Order No. 202.1.) New York City Mayor Bill de Blasio issued a similar mandate on

32

March 15, requiring that all properties used for food or drink consumption or for social gatherings operate at no greater than 50% occupancy and no greater than 50% of seating capacity. (NYC Emergency Executive Order No. 99.)

107.    On March 16, 2020, Governor Cuomo ordered all restaurants and bars in the state of New York to "***cease serving patrons food or beverage on-premises***" and permitted food and beverage service for off-premises consumption only. (NY Executive Order No. 202.03.) On the same day, Mayor Bill de Blasio ordered the closure of "all establishments – including restaurants, bars, cafes – that offer food or drink" until further notice, but permitted the establishments to "remain open for the sole purpose of providing take-out or delivery service, provided the establishments do not exceed fifty percent of their occupancy or seating capacity while persons are waiting for take-out and that such persons follow social distancing protocols." (NYC Emergency Executive Order No. 100.)

108.    These prohibitions and restrictions on Plaintiffs' properties were extended throughout the spring and summer and remain in place as of the filing date of this Complaint. The Shutdown Executive Orders were designed and intended to require physical alterations to Plaintiffs' properties to prevent the congregation of people in close proximity to one another—not because the coronavirus was found in or anywhere near Plaintiffs' properties.

109.    As New York executive officers began to consider how to safely reopen various industries in New York, they devised a gradual, phased approach, permitting particular industries and establishments to reopen with certain (often significant) restrictions in place, so long as public health data supported such reopening. Thus, on June 6 and 7, Governor Cuomo modified his

33

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 44 of 148 PageID #: 48

March 16 executive order to allow "a restaurant or bar [located in a Phase Two region] to serve patrons food or beverage on-premises only in *outdoor* space, provided such restaurant or bar is in compliance with Department of Health guidance promulgated for such activity," including six-feet social distancing guidelines. (NY Executive Order No. 202.38 (emphasis added); NY Executive Order 202.39.) To compensate for the lost indoor square footage occasioned by his March 16 order, Governor Cuomo also permitted restaurants and bars "to use (a) contiguous public space (for example, sidewalks or closed streets) and/or (b) otherwise unlicensed contiguous private space under the control of such restaurant or bar" for outdoor dining purposes, subject to certain limitations. (NY Executive Order No. 202.38.)

110.   New York City entered Phase Two on June 22, and outdoor dining in the city resumed, provided that each restaurant and bar had met all local, state, and federal health and safety requirements.

111.   Based on the various requirements in these Partial Reopening Executive Orders, Plaintiffs were forced to make material physical alterations to their premises, including by (i) ensuring that all outdoor tables are at least six feet from any other table, patron, or pedestrian thoroughfare, or enacting physical barriers where social distancing is not feasible; (ii) clearly signaling six feet of spacing in any lines for customers; (iii) designating different entrances and exits for customers and employees; and (iv) limiting party sizes to a maximum of ten persons. In addition, it was recommended that Plaintiffs use tape or signs to reduce bi-directional foot traffic in hallways and aisles, and modify or restrict the number of workstations to maintain six feet of

34

distance between employees.  During Phase Two, all indoor dining and seating areas remained closed to customers.[4]

112.    By July 6, all regions in New York, including New York City, had entered Phase Three of reopening.  In Phase Three regions outside of New York City, restrictions concerning outdoor dining remained in place, but indoor dining was permitted at no more than 50% of maximum occupancy, provided that every table was separated by a minimum of six feet or a physical barrier of at least five feet in height.[5]  Restaurants in New York City, however, were restricted to outdoor dining only, per Governor Cuomo's July 6 order that "indoor food services and dining continue to be prohibited in New York City."  (NY Executive Order No. 202.48.)

113.    By July 20, all regions in New York, including New York City, had entered Phase Four, the last of the phases before a full "reopening" is achieved.  However, even in Phase Four, as of this Complaint, indoor dining—at any capacity—remains strictly prohibited in New York City.

114.    Although certain Plaintiffs own and operate establishments outside of New York,[6] the Shutdown and Partial Reopening Executive Orders separately in effect where Plaintiffs' other

---

[4] New York Executive Order No. 202.38 requires that all bars and restaurants open for outdoor dining must do so "in compliance with Department of Health guidance promulgated for such activity."  *See also* "Reopening New York:  Outdoor and Takeout/Delivery Food Services Guidelines for Employers and Employees,"        https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/OutdoorTakeoutDeliveryFoodServicesSummaryGuidance.pdf.

[5] *See* NY Executive Order No. 202.41; Reopening New York: Food Service Guidelines for Employers and Employees," https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/Food_Services_Summary_Guidelines.pdf.

[6] For instance, Plaintiffs have locations in Chicago, IL, Washington, DC, Las Vegas, NV, Los Angeles, CA, and Boston, MA, among other cities.

35

Case 1:20-cv-04160-MKB-VMS     Document 1-1     Filed 09/04/20     Page 46 of 148 PageID #: 50

establishments are located also barred or limited on-premises food and beverage service for restaurants, bars, and other establishments, and imposed various other detrimental physical restrictions on the premises of those establishments materially similar to those described herein.

## II.     Direct Physical Loss or Damage

115.     The following Plaintiffs have each sustained "direct physical loss of" or "damage to" insured property as a result of these orders:

### A.     Aurify Brands & FGNY

116.     Aurify Brands and FGNY own and operate popular chains and national franchises in and around New York City and in several other states.  Aurify Brands owns and operates over 30 Melt Shop, Fields Good Chicken, The Little Beet, and Little Beet Table locations in the New York metropolitan area. FGNY owns 14 Five Guys locations that are operated by Aurify Brands.

117.     Before the Shutdown Executive Orders, the restaurants in the Aurify Brands family offered fast and affordable food at locations frequented by New Yorkers for lunch and dinner:

a.     Melt Shop is a popular chain in New York City for burgers, melts, chicken sandwiches, and milkshakes.  The brand is known for its comfortable atmosphere, with tables made from repurposed wood uniquely sourced from places like old bowling lanes in Upstate New York.  Melt Shops are located in busy, high-traffic neighborhoods, such as Hell's Kitchen and the Financial District, and, before the Shutdown Executive Orders, they would be packed at lunchtime with New Yorkers lined up for a fast and delicious lunch. Aurify Brands owns eleven Melt Shop locations in and around the New York metropolitan area, as well as in other states such as New Jersey and Minnesota.

36

FILED: KINGS COUNTY CLERK 08/04/2020 10:03 AM
Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 47 of 148 PageID #: 51

b. Five Guys is a nationally known fast-casual burger chain famous for its "all the way" burgers and red-and-white checkered design. Aurify Brands operates 14 Five Guys locations in Brooklyn and Manhattan, serving their famous burgers, hot dogs, fries, and shakes to hungry New Yorkers. Before the Shutdown Executive Orders, these Five Guys locations offered take-out service as well as dine-in seating at their wooden tables and booths set against red-and-white tiled walls, and large bags of peanuts.

c. Fields Good Chicken offers wholesome chicken dinners for dine-in and take-out all over New York City, including six locations in Manhattan. Each location offers a warm and inviting ambience for lunch and dinner, with wooden tables, bicycles hung on wood-paneled walls, and chalkboard menus. Before the Shutdown Executive Orders, customers would order their famous chicken at the counter, choosing from an array of sides and condiments, before settling in to eat at open high-top or low-top wooden tables.

d. The Little Beet, a chain of nine trendy, plant-inspired restaurants in New York, Washington, DC, and New Jersey, and its full-service sister brand, Little Beet Table, serve locally sourced, vegetable-forward cuisine to health-conscious New Yorkers. Before the Shutdown Executive Orders, they offered patrons a cozy, warmly lit fast-casual restaurant, with nature-inspired art on the wood-paneled walls and rustic tables, and offered fast take-out service, perfect for young New Yorkers on the go who want to eat seasonal, healthy foods. Little Beet Table locations offered the same plant-inspired food in a more upscale, full-service setting. Eight of Little Beet Table's twelve locations are in New York City.

37

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 48 of 148 PageID #: 52

118.    As a direct result of the Shutdown Executive Orders, each establishment operated by Aurify Brands incurred direct physical loss and damage.  Each location closed for normal on-premises service and was rendered physically non-functional as a restaurant or eatery.  Several properties reopened for take-out and delivery service, but with detrimental material alterations to their physical premises, including rearranging seating and furniture, installing plexiglass or other makeshift barriers, and affixing physical markers around the premises.

119.    Even after the Partial Reopening Executive Orders, each of the Aurify Brands locations has remained physically impaired.  A small number of locations have reopened for outdoor dining at a severely reduced capacity and with detrimental material alterations to their premises.  For instance, they have been forced to move tables for social distancing, physically demarcate six feet of spacing in customer lines, and erect new physical structures to enable outdoor dining and/or to separate tables where social distancing is not feasible.  Several Aurify Brands locations have permanently closed.

120.    As a direct result of the Shutdown and Partial Reopening Executive Orders, all of the restaurants owned by Aurify Brands or FGNY have suffered substantial covered losses, in an amount that will be proven at trial.

121.    At all relevant times, Aurify Brands has had in place an all-risk commercial property insurance policy, No. P-630-8N591351-COF-19, effective August 23, 2019 with Defendant Charter Oak.  (*See* Ex. 1 to Complaint.)[7]  Under this policy, Charter Oak agreed to cover

---

[7] The insurance policies, operative during the relevant time period, are attached to Complaint.  To the extent any renewal policies are applicable, they can be made available to the Court and counsel upon request and/or will be filed at the appropriate time.

"the actual loss of Business Income" sustained "due to the necessary 'suspension' of [Aurify Brands'] 'operations' during the 'period of restoration,'" caused by "direct physical loss of or damage to" the insured properties that is "caused by or result[s] from a Covered Cause of Loss." In addition, Charter Oak agreed to cover "Extra Expense." The Charter Oak policy includes coverage for all restaurants operated by Aurify Brands under the Melt Shop, Fields Good Chicken, The Little Beet, and Little Beet Table brands, for a total of 32 properties.

122.    Aurify Brands submitted its notice of claim for covered losses to Charter Oak.

123.    Charter Oak denied Aurify Brands' claim without any valid justification.

124.    At all relevant times, FGNY has had in place an all-risk commercial property insurance policy, No. BR00000615, effective July 23, 2019 with Defendant Acceptance Indemnity.[8]  (*See* Ex. 2 to Complaint.)  Under this policy, Acceptance Indemnity agreed to cover the "actual loss of Business Income" sustained "due to the necessary suspension of [FGNY's] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured properties that is "caused by or result[s] from a Covered Cause of Loss."  In addition, Acceptance Indemnity agreed to cover "Extra Expense."  The policy with Acceptance Indemnity covers the 14 Five Guys locations currently owned by FGNY and operated by Aurify Brands.

125.    FGNY submitted its notice of claim for covered losses to Acceptance Indemnity.

126.    Acceptance Indemnity denied coverage without any valid justification.

---

[8] FGNY is the first named insured on the policy.  All other named insureds that are not expressly named herein are incorporated by reference and can be found in the attached policies themselves.

39

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 50 of 148 PageID #: 54

### B.     Boqueria

127.    Boqueria owns and operates a collection of seven lively Spanish tapas bars and restaurants in New York City, Washington, D.C., and Chicago.  Boqueria is a staple of New York City, which is home to four of its locations.  Boqueria's headquarters are in New York City.

128.    Before the Shutdown Executive Orders, patrons flocked to Boqueria's establishments to enjoy a bit of Barcelona amid high-top seating and modern European design:

a.     Boqueria's maiden restaurant in Manhattan's Flatiron District was bustling with customers in its warm and inviting atmosphere.  Diners would eat on cushioned benches that line the walls, at high-top wooden tables closely-arranged in between, and at a classic white marble bar, all beneath Edison bulb pendant lighting illuminating the space.

b.     Boqueria's SoHo location maintains a similar design aesthetic in a significantly larger space, in which patrons would dine beside an open kitchen surrounded by a white marble, 12-seat chef's counter.  Despite the larger space, the cozy table arrangement created an intimate and memorable environment for diners.

c.     Boqueria expanded to the Upper East Side in 2014 with a similar design. Before the Shutdown Executive Orders, diners would fill a white-marble chef's counter and cushioned benches lining the white-painted brick walls with high-top tables nestled in between.

d.     The most recent New York addition to the Boqueria family came in 2018. In its 4,700 square foot location in Midtown West, guests would dine in an open dining room, at a white marble bar, at seats along an open kitchen, or in a spacious outdoor patio.

40

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 51 of 148 PageID
#: 55

Patrons would find themselves under an all-encompassing slatted wooden ceiling, enjoying the open atmosphere of the 27-foot windows and warm lighting.

e.    Boqueria also operates two venues in Washington, D.C. (in Dupont Circle and Penn Quarter), and one venue in Chicago, Illinois (in Fulton Market), which were bustling establishments before the Shutdown Executive Orders.

129.   As a direct result of the Shutdown Executive Orders, each Boqueria location incurred direct physical loss and damage. Each location closed for normal on-premises service and was rendered physically non-functional as a restaurant or bar. Boqueria's Upper East Side, Midtown West, SoHo, Chicago, and Washington, D.C.-Dupont Circle locations reopened for take-out and delivery service, but with detrimental material alterations to their physical premises, including rearranging seating and furniture, installing plexiglass and other makeshift barriers, affixing physical markers around the premises, and redesigning routes of entrance and egress.

130.   Even after the Partial Reopening Executive Orders, each of the Boqueria locations has remained physically impaired. The five Boqueria locations listed above have reopened for outdoor dining at a severely reduced capacity and with detrimental material alterations to their premises. For instance, Boqueria has been forced to move tables for social distancing and physically demarcate six feet of spacing in customer lines. Boqueria's Chicago and Washington, D.C.-Dupont Circle locations made similar detrimental alterations when they reopened for indoor dining at 25% and 50% capacity, respectively, as permitted by the Partial Reopening Executive Orders in their respective locations. The remaining Boqueria locations have not reopened in any capacity.

41

131.    As a direct result of the Shutdown and Partial Reopening Executive Orders, each Boqueria location has suffered substantial covered losses, in an amount that will be proven at trial.

132.    At all relevant times, Boqueria has had in place an all-risk insurance policy, No. CPO 0181459-04, effective August 1, 2019 with Defendant Zurich.[9]  (*See* Ex. 3 to Complaint.) Zurich agreed to cover "the actual loss of 'business income'" Boqueria sustained "due to the necessary 'suspension' of [Boqueria's] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured properties that is "directly caused by a 'covered cause of loss.'"   In addition, Zurich agreed to cover "Extra Expense.'"

133.    Boqueria submitted a notice of claim to Zurich for covered losses.

134.    Zurich denied coverage without any valid justification.

**C.    Branded Restaurants**

135.    The Branded Restaurants include four popular restaurants serving various types of classic American fare throughout Manhattan:  Duke's, Duke's UES, Big Daddy's, and Farmer & the Fish.

136.    Before the Shutdown Executive Orders, patrons flocked to the Branded Restaurants for Southern and American fare:

a.    Duke's is a Southern-style restaurant, reminiscent of a traditional roadhouse, located in the vibrant Murray Hill neighborhood, that, before the Shutdown

---

[9] Boqueria Operations, LLC is the first named insured on the policy.  State of Mind Holdings, LLC is also a named insured on the policy.  All other named insureds that are not expressly named herein are incorporated by reference and can be found in the attached policies themselves.

42

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 53 of 148 PageID #: 57

Executive Orders, offered Southern comfort food, large portions, self-service beer taps, and its famous Duke-A-Rita. Its dining area was filled with low-top and high-top tables, and it featured a prize wheel that customers could spin to win free drinks.

b.     Duke's UES is a Southern-style restaurant that, before the Shutdown Executive Orders, served Southern food and alcoholic drinks in a jovial environment. It is outfitted with a long wooden bar, self-service beer taps, and numerous cocktail tables.

c.     Big Daddy's is an Americana-themed diner that, since 1969, has served traditional diner fare of burgers, chicken tenders, tater tots, and milkshakes. Before the Shutdown Executive Orders, this two-floor restaurant—which features a traditional bar, colorful tables, and booths—was regularly packed with patrons.

d.     Farmer & the Fish is a community-oriented restaurant where, before the Shutdown Executive Orders, people met to enjoy reasonably priced, locally grown food and high quality seafood. Since 2016, it has offered a collection of fresh seafood from New York, including oysters, clams, shrimp, and crab. Farmer & the Fish is filled with marble-topped tables and a bar, and completes its polished look with tile floors, brick walls, hanging plants, and chandeliers.

137.    As a direct result of the Shutdown Executive Orders, each Branded Restaurant location incurred direct physical loss and damage. Each location closed for normal on-premises service and was rendered physically non-functional as a restaurant or bar. Duke's UES and Farmer & the Fish reopened for take-out and/or delivery service, but with detrimental material alterations to their physical premises, including rearranging seating and furniture, installing plexiglass or

43

other makeshift barriers, affixing physical markers around the premises, and redesigning routes of entrance and egress.[10]

138.    Even after the Partial Reopening Executive Orders, each Branded Restaurant location has remained physically impaired.  Farmer & the Fish has reopened for outdoor dining at severely reduced capacity and with detrimental material alterations to their premises.  For instance, the restaurant has been forced to move tables for social distancing, physically demarcate six feet of spacing in customer lines, provide physically separate entrances and exits for customers and employees, and erect new physical structures to enable dining and/or to separate tables where social distancing is not feasible.  Duke's and Big Daddy's have not reopened in any capacity.

139.    As a direct result of the Shutdown and Partial Reopening Executive Orders, the Branded Restaurants have suffered substantial covered losses, in an amount that will be proven at trial.

140.    At all relevant times, the Branded Restaurants have had in place an all-risk commercial property insurance policy, No. 8129T23714, effective November 15, 2019, with Defendant Strathmore.[11]  (*See* Ex. 4 to Complaint.)  Strathmore agreed to cover the "actual loss of Business Income" sustained "due to the necessary 'suspension' of [the Branded Restaurants'] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical

---

[10] Duke's UES remained open from March 15, 2020 to June 1, 2020 for limited delivery.  It is now permanently closed.

[11] Branded is the first named insured on the policy.  Duke's, Duke's UES, Big Daddy's, and Farmer & the Fish are also named insureds on the policy.  All other named insureds that are not expressly named herein are incorporated by reference and can be found in the attached policies themselves.

44

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 55 of 148 PageID #: 59

loss of or damage to" the Branded Restaurants' insured properties that is "caused by or result[s] from a Covered Cause of Loss." In addition, Strathmore agreed to cover "Extra Expense."

141. The Branded Restaurants submitted their notice of claim to Strathmore for covered losses.

142. Strathmore denied coverage without any valid justification.

**D.    Cafe Wha?**

143. Cafe Wha? was established in 1959 in Greenwich Village and has been a renowned music haunt ever since. Back then, the likes of Allen Ginsberg regularly sipped cocktails there, and the venue served as the original stomping ground for musical prodigies Bob Dylan and Jimi Hendrix. Icons like Bruce Springsteen, Peter, Paul & Mary, Kool and the Gang, as well as comedy legends like Richard Pryor began their road to stardom on its historic stage.

144. Before the Shutdown Executive Orders, Cafe Wha? showcased amazing talent nightly including three of the greatest house bands in New York City: Brazooka, Disfunktion, and The Cafe Wha? House Band. Contrasting with Cafe Wha?'s illustrious talent, the space itself is a large, plain room in the basement of 115 MacDougal Street. Originally an old horse stable, visitors must descend stairs to enter the low-lit basement, which has been left largely unchanged since the original owner personally laid broken marble on the floor and sprayed the walls black to create the feeling of a cave. Clusters of chairs and tables with blue glass candleholders surround the black stage that sits under a sign that bears the name of the establishment. Patrons would regularly fill the tight space to enjoy a delicious meal and watch Cafe Wha?'s legendary performances. Black leather booths set against exposed brick walls provided further seating.

45

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 56 of 148 PageID #: 60

145.    As a direct result of the Shutdown Executive Orders, Cafe Wha? incurred direct physical loss and damage.  It closed for normal on-premises service and was rendered physically non-functional as a music club and restaurant.

146.    Even after the Partial Reopening Executive Orders, Cafe Wha? has remained physically impaired and has not reopened.

147.    As a direct result of the Shutdown Executive Orders, Cafe Wha? has suffered substantial covered losses, in an amount that will be proven at trial.

148.    At all relevant times, Cafe Wha? has had in place an all-risk commercial property insurance policy, No. NPP8485484, effective September 17, 2019, with Defendant Western World.  (*See* Ex. 5 to Complaint.)  Western World agreed to cover "the actual loss of Business Income" Cafe Wha? sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" its insured property that is "caused by or result[s] from a Covered Cause of Loss."  In addition, Western World agreed to cover "Extra Expense."

149.    Cafe Wha? submitted a claim to Western World for covered losses.

150.    Western World denied coverage without valid justification.

**E.    The Campbell**

151.    The Campbell is an iconic New York bar and cocktail lounge situated in Grand Central Terminal at 15 Vanderbilt Avenue.  This historic New York institution pays homage to John W. Campbell, the Jazz Age financier that originally converted the space to his private office and reception hall in the 1920's.  It features soaring, 25-foot hand-painted ceilings, a grand stone

46

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 57 of 148 PageID
#: 61

fireplace, John W. Campbell's personal steel safe, a century-old leaded glass window, and original millwork.

152.    Before the Shutdown Executive Orders, patrons would flock to The Campbell for three distinct experiences in three unique spaces: The Campbell Bar, a timeless office curated with quartzite accents, bold brass and custom wood finishes, and mohair and leather furnishings; The Campbell Palm Court, an indoor oasis and lounge surrounded by towering palm trees with a view into the main terminal in Grand Central; and The Campbell Terrace, a sweeping outdoor covered veranda complete with a full bar.

153.    As a direct result of the Shutdown Executive Orders, The Campbell incurred direct physical loss and damage.  It closed for normal on-premises service and was rendered physically non-functional as a bar and lounge.

154.    Even after the Partial Reopening Executive Orders, The Campbell has remained physically impaired and has not reopened.

155.    As a direct result of the Shutdown and Partial Reopening Executive Orders, The Campbell has suffered substantial covered losses, in an amount that will be proven at trial.

156.    At all relevant times, The Campbell has had in place an all-risk commercial property insurance policy, No. PMP1103748, effective April 1, 2019 and renewed on April 1, 2020, with Defendant United National.  (*See* Ex. 6 to Complaint.)  Under the policy, United National agreed to cover "the actual loss of Business Income" The Campbell sustained "due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured property that is "caused by or

47

result[s] from a Covered Cause of Loss." In addition, United National agreed to cover "Extra Expense."

157. The Campbell submitted a notice of claim to United National for covered losses.

158. United National denied coverage without any valid justification.

**F.     City Winery**

159. Since 2008, City Winery has offered a high-end culinary and cultural experience to its guests at three locations in New York City, as well as nine other locations across the country (collectively, the "City Winery Restaurants"). The City Winery Restaurants operate as restaurants, fully functioning wineries, music venues, and private event spaces.

160. Before the Shutdown Executive Orders, the City Winery Restaurants hosted hundreds of thousands of New Yorkers annually at the following locations:

a.      City Winery New York offered a culinary and cultural experience in Manhattan's SoHo neighborhood until 2019. Customers would listen to nationally-touring performers, partake in wine education, or gather socially while enjoying globally influenced, wine-focused, and locally sourced cuisine. City Winery planned to reopen this restaurant at Pier 57 in March 2020, but has had to postpone indefinitely due to the Shutdown Executive Orders.

b.      Prior to the Shutdown Executive Orders, City Vineyard, located on Pier 26 in Hudson River Park, allowed customers to sample bottled wines as well as house-made wines on tap in its rooftop wine garden or inside the restaurant. City Vineyard also offered

48

full-service dining and hosted private events. The venue provides unobstructed views of One World Trade Center and Tribeca on one side, and full river views on the other.

c.  City Winery Rockefeller Center, located at Rockefeller Plaza in Midtown Manhattan, is an outdoor wine garden where patrons enjoyed light fare and wines on tap before the Shutdown Executive Orders. City Winery Rockefeller Center features a lounge-like setting, where patrons would sit at wooden or wine-barrel tables underneath rows of patio umbrellas and hanging string lights.

161.  In addition to these locations, City Winery hosted guests at locations in Upstate New York, Chicago, Washington, D.C., Nashville, Atlanta, Boston, and Philadelphia with similarly lively and bustling premises. The descriptions of the New York locations are representative of and similar to these other locations.

162.  As a direct result of the Shutdown Executive Orders, each City Winery Restaurant incurred direct physical loss and damage and was rendered physically non-functional as a restaurant, winery, bar, and/or music venue. Due to the Shutdown Executive Orders, nine of the locations closed for normal on-premises service, two seasonal City Winery locations, one in Chicago and one in Boston, had to delay their openings, and one City Winery New York location was prevented from opening at all. Of the twelve locations, only seven have reopened for take-out service, but with detrimental material alterations to their physical premises, including rearranging seating and furniture, installing plexiglass or other makeshift barriers, affixing physical markers around the premises, and redesigning routes of entrance and egress.

49

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 60 of 148 PageID #: 64

163.    Even after the Partial Reopening Executive Orders, each of the City Winery Restaurants have remained physically impaired.  City Winery Rockefeller Center and City Vineyard, along with two locations in Chicago, one in upstate New York, and one in Boston, have reopened for outdoor dining at severely reduced capacities and with detrimental material alterations to their premises.  For instance, these locations have been forced to move tables for social distancing, physically demarcate six feet of spacing in customer lines, and erect new physical structures to enable dining and/or to separate tables where social distancing is not feasible. City Winery's Nashville location made similar detrimental material alterations when it reopened for indoor and outdoor dining at 50% capacity, as permitted by the Partial Reopening Executive Orders in its location.

164.    As a direct result of the Shutdown and Partial Reopening Executive Orders, City Winery has suffered substantial covered losses in an amount that will be proven at trial.

165.    At all relevant times, City Winery has had in place an all-risk commercial property insurance policy, No. SNCMP0030602, effective April 1, 2019, with Defendant Arch Insurance.[12]  (*See* Ex. 7 to Complaint.)  Arch Insurance agreed to cover the "actual loss" of "Earnings" sustained "when [City Winery's] business is necessarily wholly or partially interrupted by direct physical loss of or damage to property at a covered location" unless "the loss is limited or caused by a peril that is excluded."  In addition, Arch Insurance agreed to cover "Extra Expense."

---

[12] City Winery is the first named insured on the policy.  All other named insureds that are not expressly named herein are incorporated by reference and can be found in the attached policies themselves.

166.    City Winery submitted a notice of claim to Arch Insurance for covered losses.

167.    Arch Insurance denied coverage without any valid justification.

**G.    Dive Bars**

168.    The Dive Bars are an eclectic family of traditional neighborhood bars in New York City's Upper West Side neighborhood: Dive Bar, Broadway Dive, Dive 75, and Dive 106 (collectively, "The Dive Bars").

169.    Before the Shutdown Executive Orders, each of The Dive Bars was a neighborhood magnet, providing a welcoming oasis for local New Yorkers:

    a.    Dive Bar has been an Upper West Side institution for over thirty years, where patrons flocked to relax over a drink at its long, wooden bar and to watch their favorite sports game.  In addition to the wooden tables lining its walls, Dive Bar stays true to its name, featuring a curved aquarium and dive helmets.

    b.    Broadway Dive has been a neighborhood favorite since it opened in 1991. Under its red neon "Tavern" sign, patrons would enjoy a warm and inviting atmosphere inside the eclectically-themed bar.  Broadway Dive's dark wooden walls and hanging string lights set a friendly mood; the bar also features fish tanks, bottle caps, special tap handles, neon signs, New York memorabilia, taxidermy, and local artwork.

    c.    Located in a former dive shop, Dive 75 has been a staple in the Upper West Side since 1998.  Locals would flock to this classic bar, outfitted to feel like a living room, with a couch and arm chains, and wooden stools perched by the window.  Patrons would

51

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 62 of 148 PageID #: 66

use its plentiful table space for board games or could peek at the location's fish tanks occupying the central space of the bar.

      d.    Dive 106 is a recently renovated and restored bistro-style bar and restaurant where diners could eat under a vintage tin ceiling and chandeliers, on wooden tables lining the bar's brick walls.

170.    As a direct result of the Shutdown Executive Orders, each Dive Bar location incurred direct physical loss and damage.  The Dive Bars closed for normal on-premises service and were rendered physically non-functional as bars.  Broadway Dive remained open for take-out and delivery service, and Dive Bar and Dive 106 later reopened for both services, but with detrimental material alterations to their physical premises, including rearranging seating and furniture and affixing social distancing markers around the premises.

171.    Even after the Partial Reopening Executive Orders, The Dive Bars have remained physically impaired.  Dive Bar, Broadway Dive, and Dive 106 have reopened for outdoor dining at a severely reduced capacity and with detrimental material alterations to their premises.  For instance, Dive Bar, Broadway Dive, and Dive 106 have been forced to move tables for social distancing and install new physical structures to enable dining.  Dive 75 has not reopened in any capacity.

172.    As a direct result of the Shutdown and Partial Reopening Executive Orders, The Dive Bars have suffered substantial covered losses, in an amount that will be proven at trial.

173.    At all relevant times, The Dive Bars have each had an all-risk commercial property insurance policy.  Dive 75 has had an all-risk insurance policy, No. AXPK2019RBT01836,

52

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 63 of 148 PageID #: 67

effective May 20, 2019,[13] with Defendant AXIS. (*See* Ex. 9 to Complaint.) AXIS agreed to cover "the actual loss of Business Income" Dive 75 sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" Dive 75's insured property that is "caused by or result[s] from a Covered Cause of Loss." In addition, AXIS agreed to cover "Extra Expense."

174.    Dive 75 submitted a notice of claim to AXIS for covered losses.

175.    On information and belief, Dive 75 has received communications indicating that AXIS has denied or will deny coverage of its claims without any valid justification.

176.    Dive Bar, Broadway Dive, and Dive 106 each have had an all-risk insurance policy with Defendant First Mercury: the Dive Bar policy, No. FMEV112745, effective November 9, 2019; the Broadway Dive policy, No. FMEV112500, effective September 25, 2019 (*see* Ex. 8 to Complaint); and the Dive 106 policy, No. FMEV1111467, effective April 23, 2019 and renewed on April 23, 2020.[14] In each, First Mercury agreed to cover "the actual loss of Business Income" the insured sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured property that is "caused by or result[s] from a Covered Cause of Loss." In addition, First Mercury agreed to cover "Extra Expense."

---

[13] This policy was extended in May 2020 and then renewed in July 2020.

[14] In lieu of policies, the First Mercury denial letters for Dive 106 and Dive Bar have been attached as Exhibits 10 and 11 to the Complaint; both letters contain language from the applicable insurance provisions.

53

177. Dive Bar, Broadway Dive, and Dive 106 submitted a notice of claim to First Mercury for covered losses.

178. First Mercury denied coverage to Dive Bar, Broadway Dive, and Dive 106 without any valid justification.

### H. The DL

179. The DL is a popular three-story nightclub and restaurant with a spacious rooftop bar located on the corner of Delancey and Ludlow Street in New York City.

180. Before the Shutdown Executive Orders, the first floor functioned primarily as a restaurant (called Dinner on Ludlow), with high-vaulted ceilings, hanging crystal chandeliers, and a full set of dining tables spread throughout. The second floor (called Red Room) ordinarily functioned as a lounge and nightclub space, with lounge areas, a bar, and a DJ booth. When used for private events and parties, the bar area could be filled with dining tables. The third floor (the Rooftop) had several lounge and table areas, open space, and a large bar, where bar-goers could spread out, surrounded by majestic views of the New York City skyline. The Rooftop has one of the largest retractable rooftops in New York City, which allowed year-round use. On a typical Friday or Saturday night, the DL would regularly have over 1,000 customers per night eating, drinking, and socializing late into the night, with a closing time of 4 a.m.

181. As a direct result of the Shutdown Executive Orders, The DL incurred direct physical loss and damage. It closed for normal on-premises service and was rendered physically non-functional as a restaurant, nightclub, and bar.

54

FILED: KINGS COUNTY CLERK 08/04/2020 10:03 AM
NYSCEF DOC. NO. 1

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 65 of 148 PageID
#: 69

INDEX NO. 514089/2020

RECEIVED NYSCEF: 08/04/2020

182.    Even after the Partial Reopening Executive Orders, The DL has remained physically impaired.  The DL has reopened for outdoor dining at a severely reduced capacity and with detrimental material alterations to its premises.  Only the Rooftop has been able to reopen, and The DL has been forced to move and rearrange tables for social distancing and erect new physical barriers to separate tables where social distancing is not feasible, cutting its rooftop capacity in half.  The Rooftop now holds fewer people than Dinner on Ludlow once held before the Shutdown Executive Orders.  The Rooftop has also installed plexiglass barriers around the host stand.  Dinner on Ludlow and the Red Room have not reopened in any capacity.

183.    As a direct result of the Shutdown and Partial Reopening Executive Orders, The DL suffered substantial covered losses, in an amount that will be proven at trial.

184.    At all relevant times, The DL has had in place an all-risk insurance policy, No. WKA FT00740-07, effective February 28, 2020 with Defendant Aspen American.  (*See* Ex. 12 to Complaint.)   Under that policy, Aspen American agreed to cover "the actual loss of Business Income" The DL sustained "due to the necessary 'suspension' of [it] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" The DL's property that is "caused by or result[s] from a Covered Cause of Loss."  In addition, Aspen American agreed to cover "Extra Expense."

185.    The DL submitted its notice of claim for covered losses to Aspen American.

186.    Aspen American denied coverage without any valid justification.

55

### I.    Ess-a-Bagel

187.    Ess-a-Bagel was established in 1976 by an Austrian baking family and has been serving bagels, sandwiches, and deli sides ever since, currently at two locations:  Ess-a-Bagel East and Ess-a-Bagel West.  It is regarded as having one of the best bagels in New York City.

188.    Before the Shutdown Executive Orders, each Ess-a-Bagel location served up bagels to a constant stream of locals and tourists alike, who crowded the narrow, cozy locations, and lined up often out the door and down the block:

a.    At Ess-a-Bagel East, patrons would stand before a deli case filled with shmears, cured fish, and other deli sides on one side of the restaurant.  The line of customers would snake down the middle of the restaurant and loop back around, as patrons ordered, paid, and collected their goods along the deli case.  Farther into the space were closely packed white marble tables with black cafe-style wrought iron chairs, snuggled against the warm, wood-paneled walls.

b.    Ess-a-Bagel West offered the same wide-array of deli favorites in a brighter, more modern space, with higher ceilings and modern light fixtures.  Along three walls of Ess-a-Bagel West, visitors would find display cases featuring cold deli items and baskets of fresh bagels.  Lined with a bar for seating, patrons could enjoy fresh bagels and sandwiches at the front window, or at one of the additional tables nestled behind it.

189.    As a direct result of the Shutdown Executive Orders, each Ess-a-Bagel location incurred direct physical loss and damage.  Each location closed for normal on-premises service and was rendered physically non-functional as a bagel shop. Each Ess-a-Bagel location remained

open for take-out and delivery service only, but with detrimental material alterations to their physical premises, including rearranging seating and furniture, installing plexiglass or other makeshift barriers, and affixing physical social distancing markers around the premises.

190.    Even after the Partial Reopening Executive Orders, each Ess-a-Bagel location has remained physically impaired.    Both locations have reopened for outdoor dining at a severely reduced capacity, and they have had to make detrimental material alterations to their premises. For instance, they have been forced to move tables for social distancing and erect new physical structures to enable dining and/or to separate tables where social distancing is not feasible.

191.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Ess-a-Bagel has suffered substantial covered losses, in an amount that will be proven at trial.

192.    At all relevant times, Ess-a-Bagel has had in place two all-risk commercial property insurance policies. Ess-a-Bagel West has an all-risk policy, No. BZS (20) 60 14 35 18, effective October 1, 2019, with Defendant Ohio Security. (*See* Ex. 13 to Complaint.) Ohio Security agreed to cover "the actual loss of Business Income" Ess-a-Bagel West sustained "due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" its insured property that is "caused by or result[s] from a Covered Cause of Loss." In addition, Ohio Security agreed to cover "Extra Expense."

193.    Ess-a-Bagel East has an all-risk policy, No. 16 SBA IJ7131 SB, effective March 16, 2020, with Defendant Sentinel. (*See* Ex. 14 to Complaint.) Sentinel has agreed to cover the "actual loss of Business Income" Ess-a-Bagel East sustained "due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct

57

physical loss of or physical damage to" insured property that is "caused by or result[s] from a Covered Cause of Loss." In addition, Sentinel agreed to cover "Extra Expense."

194.    Ess-a-Bagel submitted claims for covered losses to its respective insurers.

195.    Ohio Security and Sentinel denied coverage without any valid justification.

**J.    Global Dining**

196.    Global Dining operates two popular restaurants in Los Angeles and Santa Monica, California: La Boheme, an upscale bar and restaurant in West Hollywood, and 1212 Santa Monica, a large, new American restaurant in Santa Monica.

197.    Before the Shutdown Executive Orders, each restaurant welcomed patrons inside to a lively, exclusive eating experience. A massive and stunning restaurant, with high ceilings, glass chandeliers, and dark wood tables with white tablecloths, La Boheme was busy every night with a long list of reservations. 1212 Santa Monica, a healthy gourmet restaurant, filled a large dining room with patrons at dozens of tables and plush leather booths.

198.    As a direct result of the Shutdown Executive Orders, each location incurred direct physical loss and damage. Each location closed for normal on-premises service and was rendered physically non-functional as a restaurant. 1212 Santa Monica remained open for take-out and delivery service, but with detrimental material alterations to their physical premises, including rearranging seating and furniture, installing makeshift barriers, affixing social distancing markers around the premises, and redesigning routes of entrance and egress.

58

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 69 of 148 PageID #: 73

199.    Even after the Partial Reopening Executive Orders, each location has remained physically impaired.  Both restaurants reopened for limited indoor[15] and outdoor dining at a reduced capacity and with detrimental material alterations to their premises. For instance, the restaurants have been forced to move tables for social distancing, physically demarcate six feet of spacing in customer lines, provide physically separate entrances and exits for customers and employees, and erect new physical structures to enable dining and/or to separate tables where social distancing is not feasible.

200.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Global Dining suffered substantial covered losses, in an amount that will be proven at trial.

201.    At all relevant times, Global Dining has had in place an all-risk commercial property insurance policy, No. COL45974A0 effective November 1, 2019 with Defendant Sompo America.  (*See* Ex. 15 to Complaint.)    Under that policy, Sompo America agreed to cover the loss of business income resulting from "direct physical loss to covered property at covered locations caused by a covered peril."  Sompo America also agreed to cover "Extra Expense."

202.    Global Dining submitted its notice of claim for covered losses to Sompo America.

203.    Sompo America denied coverage without any valid justification.

---

[15] Reopening Executive Orders in Los Angeles permitted the reopening of both indoor and outdoor dining on May 29, subject to certain restrictions, including limitations on indoor capacity (no more than 60% of prior maximum seating capacity), social distancing requirements, and the posting of social distancing markers, among other precautions.  As of July 1, indoor dining has once again been prohibited.

59

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 70 of 148 PageID #: 74

### K.     Goldbar

204.    Goldbar has been a premier nightlife destination since 2007, nestled in New York City's North of Little Italy ("Nolita") neighborhood, and operating as a restaurant, bar, and nightlife lounge.

205.    Before the Shutdown Executive Orders, patrons who flocked to Goldbar would enter past a velvet rope, and once inside, find themselves enveloped in a luxurious, 2,500 square foot venue living up to its name.  They could look up at twelve-foot vaulted ceilings adorned with gold leaf and crystal chandeliers, and walk by golden chains draping the doorways separating the different rooms.  Before the shutdown, Goldbar was regularly packed with patrons celebrating over dinner, drinks, and dancing.

206.    As a direct result of the Shutdown Executive Orders, Goldbar incurred direct physical loss and damage.  It closed for normal on-premises service and was rendered physically non-functional as a nightlife venue.

207.    Even after the Partial Reopening Executive Orders, Goldbar has remained physically impaired and has not reopened.

208.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Goldbar has suffered substantial covered losses, in an amount that will be proven at trial.

209.    At all relevant times, Goldbar has had in place an all-risk commercial property policy, No. 060437991-00, effective November 5, 2019 with Defendant Lexington.[16] (*See* Ex. 16

---

[16] Goldbar is the first named insured on the policy.  All other named insureds that are not expressly named herein are incorporated by reference and can be found in the attached policies themselves.

60

to Complaint.)  Under an "All Risk Form," Lexington agreed to cover all "Business Interruption" losses, defined to mean "loss resulting from necessary interruption of business conducted by the Insured and caused by direct physical loss or damage by any of the perils covered herein" to Goldbar's insured property.  In addition, Lexington agreed to cover "Extra Expense."

210.     Goldbar submitted a notice of claim to Lexington for covered losses.

211.     Lexington denied coverage without any valid justification.

**L.     Grand Central Oyster Bar**

212.     Established in 1913, Grand Central Oyster Bar is the oldest restaurant in New York City's Grand Central Terminal.  It is situated within the train station's lower level.

213.     Before the Shutdown Executive Orders, New York City commuters, tourists, and other customers would enter into Grand Central Oyster Bar through its iconic, arched entrance and sit under vaulted, tiled ceilings that harken back to the era of Grand Central's construction.  Grand Central Oyster Bar is a warm, spacious, and inviting space, and features soft lighting and wood-paneled walls.  Grand Central Oyster Bar holds more than 450 tables across its two large dining rooms as well as a large bar where guests could sit and eat fresh seafood.  Before the Shutdown Executive Orders, Grand Central Oyster Bar was regularly filled with patrons throughout the day.

214.     As a direct result of the Shutdown Executive Orders, Grand Central Oyster Bar incurred direct physical loss and damage.  It closed for normal on-premises service and was rendered physically non-functional as a restaurant.

215.     Even after the Partial Reopening Executive Orders, Grand Central Oyster Bar has remained physically impaired and has not reopened.

61

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 72 of 148 PageID #: 76

216. As a direct result of the Shutdown and Partial Reopening Executive Orders, Grand Central Oyster Bar has suffered substantial covered losses, in an amount that will be proven at trial.

217. At all relevant times, Grand Central Oyster Bar has had in place an all-risk commercial property insurance policy, No. MCRD38194574, effective June 26, 2019[17] with Defendant Indemnity Insurance. (*See* Ex. 17 to Complaint.) Indemnity Insurance agreed to cover the "actual loss of Business Income" Grand Central Oyster Bar sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" Grand Central Oyster Bar's insured property that is "caused by or result[s] from a Covered Cause of Loss." In addition, Indemnity Insurance agreed to cover "Extra Expense."

218. Grand Central Oyster Bar submitted a notice of claim to Indemnity Insurance for covered losses.

219. Indemnity Insurance denied coverage without any valid justification.

**M.    Happy Cooking Restaurants**

220. Happy Cooking Hospitality operates nine unique restaurants with roots in New York City's West Village and Flatiron District: Joseph Leonard, Jeffrey's Grocery, Fedora, Fairfax, bar Sardine, Studio, George Washington Bar, Simon & the Whale, and The Jones (collectively, the "Happy Cooking Restaurants"). For years, New Yorkers have enjoyed first dates

---

[17] This policy has been renewed for another term.

at the neighborhood staple Joseph Leonard, caught up with friends at the modern speakeasy Fedora, and relaxed over oysters at Jeffrey's Grocery.

221.    Before the Shutdown Executive Orders, each of the Happy Cooking Restaurants offered patrons a distinct, exclusive dining experience, including:

    a.    Diners sought out the warm, cozy setting of the intimate, 650-square foot Joseph Leonard, featuring seven tables and a dozen bar stools amid weathered brick walls, antique light fixtures, flea-market knickknacks, and vintage, versatile furnishings, including a wooden ladder doubling as a maître d' stand.

    b.    At Jeffrey's Grocery, patrons enjoyed the premier raw bar and casual atmosphere marked by eclectic décor and distressed wood shelves hung on brick walls. Jeffrey's Grocery offered an intimate layout with less than a dozen tables and a large bar space with seats overlooking the compact kitchen.

    c.    Patrons visited the Freehand Hotel for one of Happy Cooking's three locations, including the comparatively spacious Simon & the Whale, which features a darkly polished wood bar with brass light fixtures, custom woodwork throughout the space, collections of books, glasses, and potted plants, and wraparound windows in its prime corner location.

222.    These descriptions are representative of the diverse and eclectic array of restaurants and bars owned by Happy Cooking Restaurants, each of which was similarly vibrant before the Shutdown Executive Orders.

63

223.    As a direct result of the Shutdown Executive Orders, each of the Happy Cooking Restaurants incurred direct physical loss and damage.  Each location closed for normal on-premises service and was rendered physically non-functional as a restaurant or bar.  Jeffrey's Grocery reopened for take-out service and delivery as a new concept grocery store, but with detrimental material alterations to its physical premises, including rearranging seating and furniture, installing makeshift barriers, affixing social distancing markers around the premises, and redesigning routes of entrance and egress.

224.    Even after the Partial Reopening Executive Orders, each of the Happy Cooking Restaurants has remained physically impaired.  Joseph Leonard, Jeffrey's Grocery, Fairfax, bar Sardine, and The Jones have reopened for outdoor dining at a severely reduced capacity and with detrimental material alterations to their premises.  For instance, these restaurants have been forced to move tables for social distancing, physically demarcate six feet of spacing in customer lines and post related signage, and erect new physical structures and barriers to enable outdoor dining.  As an example, Joseph Leonard had to install an outdoor patio—constructing a wooden platform up to curb level, building wooden planters to enclose the patio space, installing umbrellas, and arranging tables to meet social distancing restrictions. Fedora, Studio, George Washington Bar, and Simon & the Whale have not reopened in any capacity.

225.    As a direct result of the Shutdown and Partial Reopening Executive Orders, the Happy Cooking Restaurants have suffered substantial covered losses, in an amount that will be proven at trial.

64

Case 1:20-cv-04160-MKB-VMS     Document 1-1     Filed 09/04/20     Page 75 of 148 PageID #: 79

226.    At all relevant times, the Happy Cooking Restaurants have had in place an all-risk commercial property insurance policy, No. 21-31188331 - 38, effective July 22, 2019, and renewed on July 22, 2020, with Defendant Admiral.[18]  (*See* Ex. 18 to Complaint.)  Admiral agreed to cover "the actual loss of Business Income" the Happy Cooking Restaurants sustained "due to the necessary 'suspension' of [their] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured properties that is "caused by or result[s] from a Covered Cause of Loss."  In addition. Admiral agreed to cover the Happy Cooking Restaurants' "Extra Expense."

227.    The Happy Cooking Restaurants submitted a notice of claim to Admiral for covered losses.

228.    Admiral denied coverage without any valid justification.

**N.     Harlem Hookah**

229.    Harlem Hookah is a premier hookah lounge and restaurant in New York City's Harlem neighborhood.  Serving patrons since 2016, Harlem Hookah has created a sought-after experience for tobacco-free shisha, spirits, and dining.

230.    Before the Shutdown Executive Orders, patrons poured into Harlem Hookah's bright, upscale, and modern interior, with marble tables lining the walls, a marble wraparound bar, and elaborate chandeliers.  Guests could also sit at tables located in its outdoor cafe.

---

[18] Joseph Leonard is the first named insured on the policy.  Captain Haddock, LLC, Fedora, Jeffrey's Grocery, bar Sardine, and Fairfax are also named insureds on the policy.  All other named insureds that are not expressly named herein are incorporated by reference and can be found in the attached policies themselves.

65

231.     As a direct result of the Shutdown Executive Orders, Harlem Hookah incurred direct physical loss and damage.  It closed for normal on-premises service and was rendered physically non-functional as a lounge and restaurant.  Harlem Hookah reopened for take-out and delivery service, but with detrimental material alterations to its physical premises, including rearranging seating and furniture, installing plexiglass and other makeshift barriers, and affixing social distancing markers around the premises.

232.     Even after the Partial Reopening Executive Orders, Harlem Hookah has remained physically impaired.  Harlem Hookah has reopened for outdoor service at a severely reduced capacity and with detrimental material alterations to its premises.  For instance, Harlem Hookah has been forced to move tables for social distancing, physically demarcate six feet of spacing in customer lines, and erect new physical barriers to enable outdoor service and to separate tables where social distancing is not feasible.

233.     As a direct result of the Shutdown and Partial Reopening Executive Orders, Harlem Hookah has suffered substantial covered losses, in an amount that will be proven at trial.

234.     At all relevant times, Harlem Hookah has had in place an all-risk commercial property insurance policy, No. USA 4245913, effective May 11, 2019, with Defendant United Specialty. (*See* Ex. 19 to Complaint.)  United Specialty agreed to cover "the actual loss of Business Income" Harlem Hookah sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" Harlem Hookah's insured property that is "caused by or result[s] from a Covered Cause of Loss."  In addition, United Specialty agreed to cover Harlem Hookah's "Extra Expense."

66

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 77 of 148 PageID #: 81

235.   Harlem Hookah submitted a notice of claim to United Specialty for covered losses.

236.   United Specialty denied coverage without any valid justification.

**O.     Javelina**

237.   Javelina is a Tex Mex restaurant inspired by a Dallas chef who missed the cuisine of Texas.   It operates two locations in the heart of Manhattan:  Javelina Union Square and Javelina Upper East Side (collectively, "Javelina").

238.   Before the Shutdown Executive Orders, Javelina had bustling and colorful atmospheres where diners came to enjoy authentic Tex Mex cuisine.  New Yorkers regularly flocked to both locations to enjoy their famous margaritas, puffy tacos, fajitas, and queso.  Each location sat sixty-five people, including eleven seats at a bar.  Patrons at Javelina Upper East Side enjoyed their favorite fajitas amidst brightly painted walls with Southwestern patterns and decorations.  Patrons at Javelina Union Square sat under higher ceilings, amidst wood-paneled and brick walls in a Southwestern décor.

239.   As a direct result of the Shutdown Executive Orders, each Javelina location incurred direct physical loss and damage.  Each location closed for normal on-premises service and was rendered physically non-functional as a restaurant.  Both Javelina Union Square and Javelina Upper East Side reopened for take-out and delivery service, but with detrimental material alterations to their physical premises, including rearranging seating and furniture, affixing social distancing markers around the premises, and redesigning routes of entrance and egress.

240.   Even after the Partial Reopening Executive Orders, each Javelina location has remained physically impaired, continuing to offer limited take-out and delivery service only.

67

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 78 of 148 PageID #: 82

241.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Javelina has suffered substantial covered losses, in an amount that will be proven at trial.

242.    At all relevant times, Javelina has had in place two all-risk commercial property insurance policies, one for each of its locations.  Javelina Union Square has an all-risk policy, No. 21-31811031-32, effective October 30, 2019, with Defendant Admiral.  (*See* Ex. 20 to Complaint.) Admiral agreed to cover "the actual loss of Business Income" Javelina Union Square sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured property that is "caused by or result[s] from a Covered Cause of Loss."  In addition, Admiral agreed to cover "Extra Expense."

243.    Javelina Upper East Side has an all-risk policy, No. GK32X000282-00, effective January 5, 2020, with Defendant HDI Global.  (*See* Ex. 21 to Complaint.)  HDI Global agreed to cover "the actual loss of Business Income" Javelina Upper East Side sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured property "caused by or result[ing] from Covered Cause of Loss."  HDI Global also agreed to cover "Extra Expense."

244.    Each Javelina location submitted a notice of claim to their respective insurers for covered losses.

245.    Admiral and HDI Global denied coverage without any valid justification.

68

### P.    Junior's

246.    Boasting the best cheesecake in the world, the original Junior's is located on Flatbush Avenue in Brooklyn ("Junior's Brooklyn"), and the restaurant also has three other locations in New York City and elsewhere: Junior's Theater District, Junior's Times Square, and Junior's Connecticut (collectively, "Junior's Restaurants"). Since opening its landmark Brooklyn location in 1950, Junior's Restaurants have served burgers, deli sandwiches, and award-winning cheesecake to countless customers from around the world, among them famous actors, Hall of Fame athletes, and former presidents.

247.    Before the Shutdown Executive Orders, each of the Junior's Restaurants was a veritable train station of traffic, serving customers in spacious venues designed for that purpose:

a.    Junior's Brooklyn is a Brooklyn institution. Before the Shutdown Executive Orders, diners flocked there to dine at the friendly diner and full-service bar, featuring Brooklyn memorabilia acquired over its 70-year history. Junior's Cheesecake offers a large, bright interior, where hundreds of patrons can sit at upholstered booths, one of two glass counters, or at numerous diner-style tables.

b.    Junior's Theater District opened in 2006 and sits in the heart of New York City's Theater District. Prior to the Shutdown Executive Orders, its patrons enjoyed Junior's famous cheesecake at tables, booths, or at the curved gold bar, above white-and-orange floors. The restaurant features a bold and colorful design, including murals of the Brooklyn Dodgers and the Brooklyn Bridge.

69

c.      Junior's Times Square sits just steps from Times Square. Before the Shutdown Executive Orders, patrons would sit in its large, bright dining room with white-and-orange-colored floors and walls, large windows, and plentiful tables and booths. A large lighting feature, spelling out Junior's, hangs above the tables.

d.      Junior's Connecticut is located within the Fox Tower of Foxwoods Casino. Before the Shutdown Executive Orders, patrons would flock from the casino to eat under the restaurant's high ceilings and orange-and-purple light fixtures, surrounded by walls covered in photos and murals referencing Junior's Brooklyn origins.

248.    As a direct result of the Shutdown Executive Orders, each of the Junior's Restaurants incurred direct physical loss and damage. Each location closed for normal on-premises service and was rendered physically non-functional as a restaurant. Only Junior's Brooklyn reopened for take-out and delivery service, but with detrimental material alterations to its physical premises, including installing plexiglass or other makeshift barriers, affixing social distancing markers around the premises, and redesigning routes of entrance and egress.

249.    Even after the Partial Reopening Executive Orders, each of the Junior's Restaurants has remained physically impaired. Junior's Brooklyn has reopened for outdoor dining at a severely reduced capacity and with detrimental material alterations to its premises. For instance, Junior's Brooklyn has been forced to move tables for social distancing and erect new physical structures to enable outdoor dining and to separate tables where social distancing is not feasible. The other three Junior's Restaurants have not reopened in any capacity.

70

250.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Junior's

Restaurants have suffered substantial covered losses, in an amount that will be proven at trial.

251.    At all relevant times, each of the Junior's Restaurants has had in place an all-risk

commercial property insurance policy, No. 10UUNDE5221, effective January 1, 2020, with

Defendant Hartford.[19]  (*See* Ex. 22 to Complaint.)  Hartford agreed to cover "the actual loss of

Business Income" sustained "due to the necessary interruption of [Junior's] business operations

during the Period of Restoration due to direct physical loss of or direct physical damage to" each

of Junior's insured properties "caused by or resulting from a Covered Cause of Loss."  Hartford

also agreed to cover "Extra Expense."

252.    Each of the Junior's Restaurants submitted a notice of claim to Hartford for covered

losses.

253.    Hartford denied coverage without any valid justification.

**Q.      Peasant**

254.    Peasant is a beloved Italian restaurant that has been a Nolita staple since 1999.

255.    For over two decades, patrons have visited Peasant's warm and rustic dining room

for occasions from casual group gatherings to intimate date nights.   Before the Shutdown

Executive Orders, patrons would pack into the restaurant, which features exposed brick walls lined

with cushioned benches; small, 2-seat tables; a line of large wooden tables for dining; concrete

floors; and a prominent wood-fired oven behind the bar.  Peasant also opened a subterranean wine

---

[19] Junior's Brooklyn is the first named insured on the policy.  Junior's Theater District, Junior's Times
Square, and Junior's Connecticut are also named insureds on the policy.  All other named insureds that are
not expressly named herein are incorporated by reference and can be found in the attached policies
themselves.

71

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 82 of 148 PageID #: 86

bar below its dining room prior to the Shutdown Executive Orders, where patrons relaxed amid its intimately-spaced natural wood tables, exposed stone pillars, and slate flooring.

256.    As a direct result of the Shutdown Executive Orders, Peasant incurred direct physical loss and damage.  It closed for normal on-premises service and was rendered physically non-functional as a restaurant.

257.    Even after the Partial Reopening Executive Orders, Peasant has remained physically impaired.  Peasant has reopened for take-out, delivery, and outdoor dining at a severely reduced capacity and with detrimental material alterations to its premises.  For instance, Peasant has been forced to erect and install a new physical structure to enable dining outdoors, move tables for social distancing, and physically demarcate six feet of spacing in customer lines.

258.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Peasant has suffered substantial covered losses, in an amount that will be proven at trial.

259.    At all relevant times, Peasant has had in place an all-risk commercial property insurance policy, No. PHK-0951483-00, effective January 1, 2020, with Defendant Greenwich. (*See* Ex. 23 to Complaint.)  Greenwich agreed to cover "the actual loss of Business Income" Peasant sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured property that is "caused by or result[s] from a Covered Cause of Loss."  In addition, Greenwich agreed to cover Peasant's "Extra Expense."

260.    Peasant submitted a notice of claim to Greenwich for covered losses.

261.    Greenwich denied coverage without any valid justification.

72

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 83 of 148 PageID #: 87

### R.    Quality Branded

262.    Quality Branded operates some of New York's quintessential restaurants, including Smith & Wollensky, Quality Eats, and Quality Meats.  The group has been a staple of New York dining for decades, known for its contemporary takes on classic American dining.

263.    Quality Branded operates ten restaurants in New York: Smith & Wollensky, Maloney & Porcelli, Quality Meats, Quality Eats (with locations in the West Village, Upper East Side, and North of Madison Square Park ("NoMad")), Quality Italian, Quality Bistro, Don Angie, and Park Avenue Summer (Autumn, Winter, Spring); and two restaurants outside of New York: one Quality Italian in Denver, CO and a Quality Meats in Miami, FL.

264.    Before the Shutdown Executive Orders, Quality Branded's properties were regularly packed with customers, including at the following locations:

d.    Since 1977, patrons have flocked to the renowned steakhouse Smith & Wollensky, which seats around 400 guests.  The restaurant's spacious dining room has the atmosphere of a classic steakhouse, with dim lighting, white tablecloths, wood-paneled floors, and walls lined with pictures and plaques chronicling the restaurant's history.  The second floor features large skylights and a dark wood-stained, intimate L-shaped bar.

e.    Quality Meats takes elements from traditional butcher shops to create a rustic and inviting space.  The bi-level establishment features vintage market scales used as light fixtures, chandeliers made of pulleys and large steel butcher hooks, a staircase made with butcher block end-grain wood, and walls lined with wine bottles.  Finished

73

walnut wood planks cover the length of the wall of the dining room downstairs, where visitors would dine among warm-wood tones, exposed brick, and a white marble bar.

      f.     Patrons also visited Don Angie for modern Italian American cuisine in a sleek and intimate space. Friends dined in the inviting atmosphere, featuring blue-cushioned seating lining the walls of the main dining area, dark wood tables, large mirrors, and street-level windows. Don Angie's elegant bar is made from dark marble with gold accents, matching the backdrop of the space.

265.    These descriptions are representative of the diverse array of restaurants operated by Quality Branded, each of which was similarly vibrant before the Shutdown Executive Orders.

266.    As a direct result of the Shutdown Executive Orders, each Quality Branded location incurred direct physical loss and damage. Each location closed for normal on-premises service and was rendered physically non-functional as a restaurant. Of its 12 locations, Quality Eats (Upper East Side and West Village locations), Quality Italian (New York and Denver locations), and Don Angie, reopened for take-out and delivery service, but with detrimental material alterations to their physical premises, including rearranging seating and furniture, installing makeshift barriers, affixing social distancing markers around the premises, and redesigning routes of entrance and egress.

267.    Even after the Partial Reopening Executive Orders, each of Quality Branded's locations has remained physically impaired. Quality Eats (Upper East Side and West Village locations), Quality Italian (New York and Denver locations), and Don Angie have reopened for outdoor dining at severely reduced capacities and with detrimental material alterations to their

74

premises. For instance, these locations have been forced to move tables and erect physical barriers for social distancing purposes. Quality Italian Denver made similar alterations when it reopened for indoor dining with only 50 seats, less than 50% of its capacity, as permitted by the Partial Reopening Executive Orders in its location. Smith & Wollensky, Maloney & Porcelli, Quality Meats (New York and Miami), Quality Eats NoMad, Quality Bistro, and Park Avenue Summer (Autumn, Winter, Spring) have not reopened in any capacity.

268.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Quality Branded has suffered substantial covered losses in an amount that will be proven at trial.

269.    At all relevant times, Quality Branded has had in place an all-risk commercial property insurance policy, No. KTQ-CMB-8473R68-7-19, effective August 28, 2019, with Defendant Travelers Excess. (*See* Ex. 24 to Complaint.) Travelers Excess agreed to cover "the actual loss of Business Income" Quality Branded sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured property that is "caused by or result[s] from a Covered Cause of Loss." Travelers Excess also agreed to cover Quality Branded's "Extra Expense."

270.    Quality Branded submitted a notice of claim to Travelers Excess for covered losses.

271.    Travelers Excess denied coverage without any valid justification.

**S.    Racines NY**

272.    Racines NY is a full-service restaurant and global wine destination located in the heart of Tribeca. Opened in 2014, Racines NY works with local and sustainable farms, ranches,

75

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 86 of 148 PageID #: 90

and fisheries to provide vegetable forward and low-to-zero-waste dishes blending both French and American styles.

273.    Before the Shutdown Executive Orders, guests traveled from all over the world to sample Racine NY's food and wine amid its industrial and rustic decor, including the original 105-year-old exposed brick wall that runs the length of the restaurant.  Patrons would sit at one of the warmly lit wooden and marble tables, at a fourteen-seat wooden and marble bar, or at a four-seat interactive Chef's Counter experience facing the open kitchen.

274.    As a direct result of the Shutdown Executive Orders, Racines NY incurred direct physical loss and damage.  It closed for normal on-premises service and was rendered physically non-functional as a restaurant and bar.

275.    Even after the Partial Reopening Executive Orders, Racines NY has remained physically impaired and has not reopened.

276.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Racines NY has suffered substantial covered losses, in an amount that will be proven at trial.

277.    At all relevant times, Racines NY has had in place an all-risk commercial property insurance policy, No. 21-31867231 – 30, effective April 12, 2019 and renewed on April 12, 2020, with Defendant Admiral.  (*See* Ex. 25 to Complaint.)  Admiral agreed to cover the "actual loss of Business Income" Racines NY sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" Racines NY's insured property that is "caused by or result[s] from a Covered Cause of Loss."  Admiral also agreed to cover "Extra Expense."

76

278.    Racines NY submitted its notice of claim to Admiral for covered losses.

279.    Admiral denied coverage without any valid justification.

**T.    Red Hook Lobster Pound**

280.    Red Hook Lobster Pound is a premier seafood destination in Brooklyn's Red Hook neighborhood.  What started as a counter-service operation over a decade ago has evolved into a full-service, nautically-themed restaurant, complete with ship rope tied around skinny pipes, walls painted with nautical flags, and picnic-style seating.  Its second location, Red Hook Lobster Pound Vanderbilt, opened in 2015 in the contemporary industrial food hall Urbanspace Vanderbilt in Midtown Manhattan.

281.    Before the Shutdown Executive Orders, each of the Red Hook Lobster Pound locations was packed with diners.

    a.    Diners flocked to the original restaurant in Brooklyn, nicely situated on the water, and enjoyed fresh lobsters and oysters in a 70-seat dining area with a wooden wraparound bar and wooden tables ordinarily packed throughout the space.

    b.    Drawn in by its large, lobster-claw-shaped neon sign advertising Lobsters, Oysters, and Beer, its red-and-blue Red Hook Lobster Pound banner, and its many hanging buoys and fake lobsters, patrons clamored to enjoy fresh lobsters and oysters at Red Hook Lobster Pound Vanderbilt's wooden bar-side stools or amid the centralized indoor seating of the food hall.

282.    As a direct result of the Shutdown Executive Orders, each Red Hook Lobster Pound location incurred direct physical loss and damage.  Each location closed for normal on-premises

service and was rendered physically non-functional as a restaurant and bar.  The Brooklyn location reopened for take-out and delivery service, but with detrimental material alterations to its physical premises, including rearranging seating and furniture, installing makeshift barriers, affixing social distancing markers around the premises, and redesigning routes of entrance and egress.   For example, the Brooklyn location converted its bar into a makeshift take-out window, set up a table outside for distributing take-out orders, and moved tables to create a barrier preventing customers from going past the front take-out window.

283.    Even after the Partial Reopening Executive Orders, Red Hook Lobster Pound has remained physically impaired.  The Brooklyn location has reopened for outdoor dining at a severely reduced capacity (less than 1/3 of its prior total seating capacity) and with detrimental material alterations to its premises.  For instance, it has been forced to move tables for social distancing, physically demarcate six feet of spacing in customer lines, and erect new physical structures to enable outdoor dining and to separate tables where social distancing is not feasible. Red Hook Lobster Pound Vanderbilt has not reopened in any capacity.

284.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Red Hook Lobster Pound and Red Hook Lobster Pound Vanderbilt suffered substantial covered losses, in an amount that will be proven at trial.

285.    At all relevant times, Red Hook Lobster Pound has had in place an all-risk commercial property insurance policy, No. BP011456P2019, effective April 22, 2019 and renewed

78

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 89 of 148 PageID #: 93

on April 22, 2020, with Defendant MetLife.[20]  (*See* Ex. 26 to Complaint.)  MetLife agreed to cover "the actual loss of Business Income" Red Hook Lobster Pound sustained "due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured property that is "caused by or result[s] from a Covered Cause of Loss."  MetLife also agreed to cover Red Hook Lobster Pound's "Extra Expense."

286.    Red Hook Lobster Pound submitted a notice of claim to MetLife for covered losses.

287.    MetLife denied coverage without any valid justification.

288.    Red Hook Lobster Pound Vanderbilt has also had, at all relevant times, an all-risk commercial property insurance policy, No. 680-1L517925-19-42, effective July 16, 2019 and renewed on July 16, 2020, with Defendant Travelers Casualty.  (*See* Ex. 27 to Complaint.)[21] Travelers Casualty agreed to cover "the actual loss of Business Income" Red Hook Lobster Pound Vanderbilt sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured property that is "caused by or result[s] from a Covered Cause of Loss."  Travelers Casualty also agreed to cover Red Hook Lobster Pound Vanderbilt's "Extra Expense."

289.    Red Hook Lobster Pound Vanderbilt submitted a notice of claim to Travelers Casualty for covered losses.

---

[20] Red Hook Lobster Pound is a named insured on the policy.  All other named insureds that are not expressly named herein are incorporated by reference and can be found in the attached policies themselves.

[21] The Travelers Casualty Policy was first issued in July 2018, and that original policy is attached as Exhibit 27.  The Policy was renewed again in 2019 and 2020.

79

290. Travelers Casualty denied coverage without any valid justification.

**U.    Schnippers**

291. Schnippers is a family-owned chain of classic American restaurants in New York City. Founded by two brothers, Jonathan and Andrew Schnippers, Schnippers' four New York City locations—Schnippers Tribeca, Schnippers Times Square, Schnippers Midtown, and Schnippers FiDi—serve a variety of classic and specialty burgers, sandwiches, salads, milkshakes and sides.

292. Before the Shutdown Executive Orders, each of the popular and conveniently located Schnippers locations was packed full of New Yorkers, particularly during the lunch rush. In each, diners would fill tables, booths, and bar seating, often up to the capacity of the location. At some of the Schnippers locations, diners would sit together at communal seating, or at small wooden tables pushed together to allow large groups to eat the famous burgers and sandwiches together. The floor to ceiling glass windows in some locations allowed tourists to take in the city while enjoying their meal.

293. As a direct result of the Shutdown Executive Orders, each Schnippers location incurred direct physical loss and damage. Each location closed for normal on-premises service and was rendered physically non-functional as a restaurant. Schnippers Times Square and Schnippers Midtown remained open for take-out and delivery service, but with detrimental material alterations to their physical premises, including rearranging seating and furniture, installing plexiglass or other makeshift barriers, and affixing social distancing markers around the premises.

80

294.    Even after the Partial Reopening Executive Orders, the Schnippers' locations have remained physically impaired.  Schnippers Times Square reopened for outdoor dining at severely limited capacity and with detrimental material alterations to its premises.  For instance, the restaurant has been forced to move tables for social distancing, physically demarcate six feet of spacing in customer lines, and erect plexiglass barriers at the cash registers.  Schnippers Tribeca has permanently closed.

295.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Schnippers has suffered substantial covered losses, in an amount that will be proven at trial.

296.    At all relevant times, Schnippers had in place an all-risk commercial property insurance policy, No. 12 SBA AA7086 SB, effective May 22, 2019 and renewed on May 22, 2020, with Defendant Twin City.  (*See* Ex. 29 to Complaint.)  Under this policy, Twin City agreed to cover the "actual loss of Business Income" Schnippers sustained "due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or physical damage to" the insured properties that is "caused by or result[s] from a Covered Cause of Loss."  Twin City also agreed to cover "Extra Expense."  This policy covered Schnippers' Times Square and Midtown locations.

297.    Schnippers submitted its notice of claim for covered losses to Twin City.

298.    Twin City denied coverage without any valid justification.

299.    At all relevant times, Schnippers has had in place an all-risk commercial property insurance policy, No. PHK-0951317-00, effective March 18, 2019, with Defendant XL Insurance.

81

FILED: KINGS COUNTY CLERK 08/04/2020 10:03 AM
NYSCEF DOC. NO. 1

INDEX NO. 514089/2020

RECEIVED NYSCEF: 08/04/2020

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 92 of 148 PageID
#: 96

(*See* Ex. 28 to Complaint.)[22]  Under this policy, XL Insurance agreed to cover the "actual loss of
Business Income" Schnippers sustained "due to the necessary 'suspension' of [its] 'operations'
during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or
damage to" the insured properties that is "caused by or result[s] from a Covered Cause of Loss."
XL Insurance also agreed to cover "Extra Expense."  This policy covered Schnippers' FiDi and
Tribeca locations.

300.  Schnippers submitted its notice of claim for covered losses to XL Insurance.

301.  Upon information and belief, Schnippers has received communications indicating
that XL Insurance has denied or will deny coverage of its claims without any valid justification.

## V.  Stout

302.  Stout NYC Hospitality Group ("Stout") operates twelve popular American bars and
restaurants around New York City.  Three of Stout's restaurants operate under its flagship name
and offer comfort food, salads, and a long list of popular and hard-to-find beers (the "Stout Pubs").
In addition, Stout operates nine restaurants throughout Queens and Manhattan under the following
names:  Féile, the Independent, Maggie's Place, Amity Hall (two locations), the Long Room, the
Half Pint, Rivercrest, and One Mile House (collectively, the "Stout Restaurants").

303.  Before the Shutdown Executive Orders, the each of the Stout locations was a
bustling and thriving New York City establishment:

---

[22] Schnippers is the first named insured on the policy.  All other named insureds that are not expressly
named herein are incorporated by reference and can be found in the attached policies themselves.

82

FILED: KINGS COUNTY CLERK 08/04/2020 10:03 AM
INDEX NO. 514089/2020
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 08/04/2020

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 93 of 148 PageID
#: 97

a.      For the three Stout Pubs, patrons would be welcomed inside with a cheerful

pub atmosphere.  Patrons would pour into Stout's original location near Madison Square

Garden, a towering three-story Irish pub where they could order from over 175 beer choices

and more than 65 Irish whiskies.  They would fill into Stout's Financial District location,

with its spacious lounge area and large dining room with painted brick walls.  Diners would

file into the Stout's Grand Central location's booth and table seating, accented by rich

wallpaper, antique mirrors, and a wooden coffered ceiling.  Prior to the Shutdown

Executive Orders, each Stout location was a full-service restaurant regularly packed for

dinner and happy hour, and each offered a variety of popular spaces for private events.

b.      At the Stout Restaurants, diners would go for an authentic and charming

pub dining experience, complete with rustic wood bars, exposed brick, and warm lighting.

For instance, Amity Hall in Greenwich Village is a large American restaurant, with sleek

dark wood tables and a wraparound bar with ample seating. Before the Shutdown

Executive Orders, this Village mainstay was bustling all day long, popular for weeknight

drinks and weekend sports games projected on the televisions above the bar.  The Long

Room, another Stout establishment, gave diners a more upscale experience, with a marble

oyster bar and elegant bookshelves lining the walls.  And patrons flocked to One Mile

House, a vintage-inspired gastropub in the Lower East Side, described as having "the soul

of a Prohibition era watering hole" with a large selection of beers, craft cocktails, and

gourmet food in a cozy environment with a classic wood burning stove.  These descriptions

83

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 94 of 148 PageID #: 98

are representative of the eclectic array of restaurants operated by Stout, each of which offered a unique neighborhood experience before the Shutdown Executive Orders.

304.    As a direct result of the Shutdown Executive Orders, each Stout location incurred direct physical loss and damage.  Each of the locations closed for normal on-premises service and was rendered physically non-functional as a restaurant or bar.  Several of the Stout Restaurants and the Stout Pubs in the Financial District and Grand Central locations have reopened for take-out and delivery service, but with detrimental material alterations to their physical premises, including rearranging seating and furniture, installing plexiglass or other makeshift barriers, affixing physical markers around the premises, and redesigning routes of entrance and egress.

305.    Even after the Partial Reopening Executive Orders, each of Stout's locations has remained physically impaired.  Amity Hall on the Upper West Side, Stout Grand Central, the Half Pint, and Rivercrest have reopened for outdoor dining at a severely reduced capacity and with detrimental material alterations to their premises. They have been forced to move tables for social distancing, physically demarcate six feet of spacing in customer lines, provide physically separate entrances and exits for customers and employees, and erect new physical structures to enable dining and/or to separate tables where social distancing is not feasible.

306.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Stout has suffered substantial covered losses, in an amount that will be proven at trial.

307.    At all relevant times, Stout has had in place an all-risk commercial property insurance policy, No. VET-GF00643190, as amended, effective April 10, 2019 and renewed on June 9, 2020 with Defendants United Specialty and Defendant National Fire.  (*See* Ex. 30 to

84

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 95 of 148 PageID #: 99

Complaint.) Under this policy, United Specialty and National Fire agreed to cover "the actual loss of Business Income" Stout sustained due to the "necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" Stout's insured properties that is "caused by or result[s] from a Covered Cause of Loss." United Specialty and National Fire also agreed to cover "Extra Expense."

308. Stout submitted a notice of claim for covered losses to United Specialty and National Fire.

309. On information and belief, Stout has received communications indicating that United Specialty and National Fire have denied or will deny coverage of its claims without any valid justification.[23]

### W. Sweetwater Social

310. Sweetwater Social is a subterranean cocktail lounge in the heart of the North of Houston ("NoHo" neighborhood). Serving customers since 2014, Sweetwater Social has been a go-to hangout for New Yorkers and visitors looking to celebrate and relax in a playful and friendly environment.

311. Before the Shutdown Executive Orders, Sweetwater Social was a bustling underground lounge, situated just down a flight of stairs below street level. Featuring industrial architecture and classic speakeasy elements, the lounge offered its patrons a uniquely intimate and celebratory environment. Patrons could enjoy the premises' long, wooden bar with stools, plentiful cocktail tables, plush lounge seating, and foosball table and shuffleboard.

---

[23] United Specialty has also denied a similar claim submitted by Plaintiff Harlem Hookah.

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 96 of 148 PageID #: 100

312.     As a direct result of the Shutdown Executive Orders, Sweetwater Social incurred direct physical loss and damage.  It closed for normal on-premises service and was rendered physically non-functional as a restaurant and bar.

313.     Even after the Partial Reopening Executive Orders, Sweetwater Social has remained physically impaired and has not reopened.

314.     As a direct result of the Shutdown and Partial Reopening Executive Orders, Sweetwater Social has suffered substantial covered losses in an amount that will be proven at trial.

315.     At all relevant times, Sweetwater Social has had in place an all-risk commercial property insurance policy, No. ▇▇▇▇▇▇ effective November 5, 2019, with Defendant Lexington.[24]  (*See* Ex. 31 to Complaint.)  Under an "All Risk Form," Lexington agreed to cover all "Business Interruption" losses, defined to mean "loss resulting from necessary interruption of business conducted by the Insured and caused by direct physical loss or damage by any of the perils covered herein" to Sweetwater Social's insured property.  In addition, Lexington agreed to cover "Extra Expense."

316.     Sweetwater Social submitted a notice of claim to Lexington for covered losses.

317.     Lexington denied coverage without any valid justification.

**X.     Tarallucci e Vino**

318.     Tarallucci e Vino was established in 2001 by a native of Abruzzo, Italy and has been a New York fixture ever since.  The Tarallucci e Vino brand operates five Italian restaurants.

---

[24] Sweetwater Social is the first named insured on the policy.  All other named insureds that are not expressly named herein are incorporated by reference and can be found in the attached policies themselves.

86

Each location offers an inviting gathering place that embodies the ease and casual elegance of Italy's bar and cafe culture. The restaurants honor the famous Italian saying, "tutto finisce a Tarallucci e Vino," meaning that any matter can be resolved over a glass of wine and tarallucci, the classic round Italian cookie. Tarallucci e Vino has also expanded to provide two event spaces, ranging from lofts for weddings and celebratory events to lecture halls for academic and community-based activities.

319.    Before the Shutdown Executive Orders, the Tarallucci e Vino restaurants served locally sourced, regional Italian fare and a wide range of wines by the glass to hungry New Yorkers. The Tarallucci e Vino event venues provided beautiful and diverse locations for events:

c.      Prior to the Shutdown Executive Orders, patrons would enter Tarallucci e Vino Union Square by climbing concrete stairs through a wide and open walkway. Patrons would sip wine at wooden high-top tables or enjoy cocktails at a large concrete bar with metal stools, part of the restaurant's industrial design aesthetic. A long, communal table runs down the center of the restaurant, with booths flanking the walls on either side. Tarallucci e Vino Union Square is also home to five separate venue spaces, with the capacity to host up to 745 guests at one time. The Fifth Floor Loft is a large room decorated in an eclectic style, with antique chandelier and furniture, exposed brick walls, and oversized windows with courtyard views. The Mezzanine provides a more intimate environment reminiscent of a speakeasy setting, with exposed bricks, custom wooden tables, and a private bar and lounge. The Sixth Floor Loft provides a bright airy space, decorated in all white and peach tones, with antique chandeliers, vintage mirrors, and a

87

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 98 of 148 PageID #: 102

courtyard view.  The Fourth Floor Loft exudes a rustic vibe, with barn doors, original tin ceilings, and floor-to-ceiling windows.  The Third Floor Loft is particularly well-suited to culinary events, with exposed brick, floor-to-ceiling windows, views of Union Square, and a state-of-the-art show kitchen.

   d. Prior to the Shutdown Executive Orders, Tarallucci e Vino Nomad offered Italian favorites in an airier space, defined by high ceilings and light wood accents.  Upon entry, visitors found an L-shaped bar where patrons would sit under a metal chandelier with lightbulbs encased in glass globes.  The wall adjacent to the bar features a sculptural wine rack with pegs suspending wine bottles, and the back of the bar is home to large, open-cubed shelving, filled with additional wine bottles and plants.  Behind the bar area, caramel-colored booths snake around the perimeter of the seating area, while round tables and mid-century modern chairs fill the center of the dining room.

   e. Tarallucci e Vino Cooper Hewitt features a cafe and special event venue inside the renowned Cooper Hewitt Smithsonian Design Museum, the only museum in the United States devoted to historical and contemporary design. Housed in the illustrious and historic Georgian-style Andrew Carnegie Mansion, the Tarallucci e Vino Cooper Hewitt cafe provided cafe fair daily to hungry museum-goers prior to the shutdown; patrons would order beer and wine, pastries, and other fare from the cafe counter.  There was also a gelato stand and seating under shaded umbrellas in the Arthur Ross garden and terrace.  Tarallucci e Vino Cooper Hewitt also provided multiple spaces for celebration and study prior to the Shutdown Executive Orders.  For instance, located on the ground floor of the Carnegie

88

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 99 of 148 PageID #: 103

Mansion, Cooper Hewitt's Lecture Room offered a contemporary space with bright accents and glass walls, suited for lectures, film screenings, press events, meetings, and seminars. Located in the Miller/Fox Townhouses adjacent to the Carnegie Mansion, the Trustees Room overlooked the Arthur Ross Terrace and Garden and provided an elegant, intimate setting with a marble fireplace, built-in shelves, a geometric patterned-rug, and cream-colored walls.

f.    Prior to the Shutdown Executive Orders, Tarallucci e Vino East Village served Italian fare in an atmosphere that married the interior and exterior spaces of the restaurant.  The restaurant often opened the large, windowed doors along one wall to create a feeling of alfresco dining indoors.  Patrons ate at the long, L-shaped white marble bar behind which wine bottles were stacked to the ceiling.  In the rear of the restaurant, a burnt-orange leather booth spanned the length of the wall and wrapped around the back with tables nestled in between.

g.    Tallucci E Vino Upper West Side's outdoor patio and cozy interior made it a neighborhood favorite spot for breakfast, lunch, or a coffee break. The restaurant features dark wood floors and high, dark ceilings offset by clean white walls and white marble cafe tables.  Prior to the shutdown, pastries were piled atop the rustic grey-and-white bar and wine bottles sat in inlaid cabinets behind the bar.  A long rectangular mirror hangs on one wall, while another wall features wine racks that stretch to the ceiling, with a sliding wood ladder to retrieve bottles on the highest shelves.

89

320.    As a direct result of the Shutdown Executive Orders, each Tarallucci e Vino location incurred direct physical loss and damage.  Each location closed for normal on-premises service and was rendered physically non-functional as a restaurant or event venue.  Only Tarallucci e Vino Upper West Side remained open for take-out and delivery service, but with detrimental material alterations to its physical premises, including rearranging seating and furniture, installing plexiglass or other makeshift barriers, affixing physical markers around the premises, and redesigning routes of entrance and egress.

321.    Even after the Partial Reopening Executive Orders, Tarallucci e Vino locations have remained physically impaired.   Tarallucci e Vino Union Square, Tarallucci e Vino East Village, and Tarallucci e Vino Upper West Side have reopened for outdoor dining at a severely reduced capacity and with detrimental material alterations to its premises.  For instance, the restaurants have been forced to move tables for social distancing, physically demarcate six feet of spacing in customer lines, and erect new physical structures to enable dining and/or to separate tables where social distancing is not feasible.  Tarallucci e Vino Nomad and Talucci E Vino Cooper Hewitt have not reopened in any capacity.

322.    As a direct result of the Shutdown and Partial Reopening Executive Orders, Tarallucci e Vino has suffered substantial covered losses, in an amount that will be proven at trial.

323.    At all relevant times, Tarallucci e Vino has had in place three all-risk commercial property insurance policies.  Tarallucci e Vino East Village has an all-risk policy, No. BOP 12101119 17, effective July 27, 2019 and renewed on July 27, 2020, with Defendant Utica First. (*See* Ex. 34 to Complaint.)  Utica First agreed to cover the loss of "Earnings" Tarallucci E Vino

90

East Village sustained during the period when its business "is necessarily interrupted by loss or damage to" insured property that is "by a peril covered during the policy period." Utica First also agreed to cover "Extra Expenses."

324.    Tarallucci e Vino Nomad, Tarallucci e Vino Union Square, Tarallucci e Vino Cooper Hewitt, and Tarallucci e Vino Upper West Side (collectively, the "Tarallucci e Vino Admiral Plaintiffs") have two all-risk policies, effective March 1, 2020, with Defendant Admiral: No. 21-31659631-35 (for Tarallucci e Vino Nomad) (*see* Ex. 33 to Complaint) and No. 21-31065931 – 37 (for Tarallucci e Vino Union Square, Tarallucci e Vino Cooper Hewitt, and Tarallucci e Vino Upper West Side) (*see* Ex. 32 to Complaint). Admiral agreed to cover the "actual loss of Business Income" the Tarallucci e Vino Admiral Plaintiffs sustained "due to the necessary 'suspension' of [their] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured properties that is "caused by or result[s] from a Covered Cause of Loss." Admiral also agreed to cover "Extra Expense."

325.    All Tarallucci e Vino locations submitted claims for covered losses to Utica First and Admiral.

326.    Utica First and Admiral denied coverage to Tarallucci e Vino East Village and Tarallucci e Vino Nomad, respectively, without any valid justification. On information and belief, the remaining Tarallucci e Vino Admiral Plantiffs have received communications indicating that Admiral has denied or will deny coverage of its claims without any valid justification, as it did for Tarallucci e Vino Nomad.

91

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 102 of 148 PageID
                                     #: 106

**Y.    Tito Rocks Bars**

327.    Tito Rocks owns and operates three gay bars in Manhattan:  Pieces Bar, Hardware Bar, and Playhouse Bar (collectively, the "Tito Rocks Bars").

328.    Before the Shutdown Executive Orders, the Tito Rocks Bars were unique gathering spaces for the LGBTQ community in New York City:

a.    Located in the Hell's Kitchen neighborhood of New York City—and minutes from Times Square, the Theater District, and Restaurant Row—Hardware Bar was a staple of New York's LGBTQ nightlife.  Patrons would enjoy a stocked bar with shelves of liquor spanning the length of the bar beneath its hangar-style ceiling.  They would crowd to the back of the bar to an often-neon-lit stage that showcased the City's most talented drag queens and best DJ's.

b.    One of New York City's oldest operating gay bars, Pieces Bar was an LGBTQ institution and celebrity hangout, located in the thriving West Village neighborhood of New York City.  Upon entering, guests were greeted with a façade emblazoned with rainbow lettering spelling out the name of the bar, welcoming the community in a neighborhood that is a hotspot for LGBTQ nightlife.  Performances would happen both on stage and on the floor of the bar, which was flanked by cafe tables and chairs.

c.    Also located in the West Village, Playhouse Bar, which opened in December 2019, was a dance-oriented bar and lounge, playing Top-40 hits and electronic dance music on the weekends without a cover charge.  Patrons would walk through double

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 103 of 148 PageID #: 107

doors leading down to a rectangular room with loft-style windows and an arched proscenium with a red velvet curtain.  They would order drinks at a long bar running along an exposed brick wall where the word "Playhouse" was spray-painted in a rainbow of colors by a renowned graffiti artist.  They would dance in front of a stage that showcased a variety of New York's most talented performers.

329.    As a direct result of the Shutdown Executive Orders, each of the Tito Rocks Bars incurred direct physical loss and damage.  Each location closed for normal on-premises service and was rendered physically non-functional as a bar.

330.    Even after the Partial Reopening Executive Orders, the Tito Rocks Bars have remained physically impaired.  Pieces Bar and Hardware Bar have reopened for outdoor dining and take-out service at a severely reduced capacity and with detrimental material alterations to their premises.  For instance, the two bars have been forced to space out tables for social distancing and to physically demarcate six feet of spacing in customer lines.  The indoor premises at both bars remains closed, and the bars are unable to offer the sort of DJ or drag performances that ordinarily drive sales.  Playhouse Bar has not reopened in any capacity.

331.    As a direct result of the Shutdown and Partial Reopening Executive Orders, the Tito Rocks Bars have suffered substantial covered losses, in an amount that will be proven at trial.

332.    At all relevant times, each of the Tito Rocks Bars has had in place an all-risk commercial property insurance policy, No. WKAFTC 0109-02, effective November 3, 2019, with

93

FILED: KINGS COUNTY CLERK 08/04/2020 10:03 AM
NYSCEF DOC. NO. 1

INDEX NO. 514089/2020
RECEIVED NYSCEF: 08/04/2020

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 104 of 148 PageID
#: 108

Defendant Aspen American.[25]  (*See* Ex. 35 to Complaint.)  Aspen American agreed to cover "[t]he actual loss of Business Income" the Tito Rocks Bars sustained "due to the necessary 'suspension' of [their] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured properties that is "caused by or result[s] from a Covered Cause of Loss."  Aspen American also agreed to cover "Extra Expense."

333.    The Tito Rocks Bars submitted a claim to Aspen American for covered losses.

334.    Aspen American denied coverage without any valid justification.

**Z.      Union Square Hospitality Group**

335.    USHG operates some of New York's most beloved restaurants, cafes, and bars, including Union Square Cafe, The Modern, and Gramercy Tavern; as well as nationally recognized venues in Washington, D.C., Las Vegas, and beyond; and a renowned full-service catering and events business.

336.    USHG operates over 25 locations in New York, ranging from standalone venues like Gramercy Tavern in Manhattan's Flatiron District to venues inside stadiums, parks, and museums, like Tacocina in Brooklyn's Domino Park.  USHG's New York City properties include: The Modern, Gramercy Tavern, Maialino, Tacocina, Union Square Cafe, Blue Smoke (2 locations), Jazz Standard, Cafe 2, Terrace Cafe, Marta, Porchlight, Untitled, Studio Cafe, Daily Provisions (2 locations), Vini e Fritti, Caffe Marchio, Manhatta & the Bay Room, Intersect by Lexus, and Cedric's at The Shed.  Several additional properties are located inside larger venues,

---

[25] Tito Rocks is listed as the policy's first named insured.  The other named insureds on the policy are Pieces Bar, Hardware Bar, and Playhouse Bar.

94

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 105 of 148 PageID #: 109

including the cafe inside the 9/11 Memorial & Museum, as well as Shake Shacks and Blue Smokes at Saratoga Race Course and Citi Field. Outside of New York, USHG operates venues in Washington, D.C., and several Shake Shack and other locations inside stadiums, including at Nationals Park in Washington, D.C., T-Mobile Arena in Las Vegas, NV, Wells Fargo Center in Philadelphia, PA, M&T Bank Stadium in Baltimore, MD, Minute Maid Park in Houston, TX, and Empower Field at Mile High in Denver, CO. USHG also operates a full-service catering and venue hospitality business, Union Square Events, which caters events at USHG's exclusive venues as well as other locations.

337. Before the Shutdown Executive Orders, the USHG venues were thoughtfully designed to serve dining rooms filled with customers, including at the following locations:

g. Patrons enjoyed contemporary American cuisine, warm hospitality, and unparalleled service at Gramercy Tavern. Located inside New York's historic Bullmoose building, Gramercy Tavern has long been regarded as one of the most popular restaurants in New York City. Amid neo-Colonial décor, sprawling murals, and elaborate flower displays, patrons have flocked here to enjoy a once-in-a-lifetime meal since 1994.

h. The Modern captures the iconic feel of New York's Museum of Modern Art ("MoMA") where it is located. Since 2005, visitors have enjoyed a refined, contemporary meal overlooking the MoMA's sculpture garden. The space is elegant and open, featuring a luminescent glass wall, a 46-foot marble bar floating above a lighted glass base, and Danish furniture and tableware from modernist designers.

95

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 106 of 148 PageID #: 110

i.      Locals and tourists alike dined in the fresh, contemporary environment of Union Square Cafe, USHG's maiden restaurant. A New York favorite since 1985, the Cafe would consistently fill to its 278-seat capacity with USHG's adjoining first Daily Provisions location. The bi-level cafe features a spacious, open floorplan with wide-plant cherry wood floors, green and white concrete tiles surrounding the bar area on the first floor, and large, generous windows framing views of the neighborhood. Art lines the walls throughout the space, and its intimate second-floor bar area features a 12-foot bar fashioned from wood salvaged from its original location and original glass pendant lights.

j.      Patrons relaxed over tacos and margaritas under the red-and-white umbrellas at Tacocina, a relatively recent addition to the USHG family, opening in 2017. Patrons would flock to this popular, casual eatery to sit at multi-colored chairs and picnic tables with a view of Manhattan from Domino Park in Williamsburg.

k.      New Yorkers and world travelers visited Intersect by Lexus for meals prepared by innovative and emerging culinary talent from across the world as part of its Global Chef-in-Residence program. With a 185-person maximum occupancy, this second-floor restaurant features a cocktail lounge with a 360-degree round bar, seating along the counter of an open-kitchen, and tables spaced between marbled walls. The unique space also features a cafe and public gallery space on the ground floor, and a private gallery on the top floor.

l.      Patrons also visited the lively Marta located inside the Redbury New York hotel. The restaurant has been a neighborhood gathering space since 2014, known for its

96

family-style roasts, grilled seafood, vegetables cooked over open fire, and thin-crust pizza. The polished dining room, which can seat up to 148 patrons, features high ceilings, a long white marble counter alongside the open kitchen with its two large wood-fire ovens, and dark wooden tables spaced throughout. The second floor of the restaurant features the Gibson Room, which can be booked for events with up to 200 guests.

m.     Since 2017, patrons climbed 60 stories for the stunning views of lower Manhatta at Manhatta, a restaurant and full-service event space. The fine-dining establishment, with a maximum occupancy of 139 guests, features floor-to-ceiling glass windows, wood-paneled floors with walnut-hued tables and soft lighting amid a spacious, open floorplan that emphasizes the surrounding views. The Bay Room at Manhatta is USHG's first dedicated event space, hosting a diverse range of events from weddings and galas to personal celebrations and corporate gatherings. This sweeping, grand space offers the same panoramic views of Manhattan for up to 600 guests.

338.    These descriptions are representative of the diverse and eclectic array of restaurants and bars owned by USHG, each of which was similarly vibrant before the Shutdown Executive Orders.

339.    As a direct result of the Shutdown Executive Orders, each USHG location incurred direct physical loss and damage. Each of the locations closed for normal on-premises service and was rendered physically non-functional as a restaurant, eatery, bar, or cafe. Of USHG's locations, only Gramercy Tavern, Tacocina, Intersect, Marta, Blue Smoke (in Battery Park City), Daily Provisions (both locations), and Union Square Cafe reopened for take-out and/or delivery service,

97

but with detrimental material alterations to their physical premises, including rearranging seating and furniture, installing plexiglass or other makeshift barriers, affixing physical markers around the premises, and redesigning routes of entrance and egress.  The Shutdown Executive Orders have also rendered Union Square Events physically non-functional as a profitable catering business.  As a direct result of the Shutdown Executive Orders, Union Square Events' catering and hospitality events have been canceled, including events expected to be attended by thousands of people.

340.    Even after the Partial Reopening Executive Orders, each of USHG's locations has remained physically impaired.  Union Square Cafe, Tacocina, Blue Smoke (in Battery Park City), and Daily Provisions (both locations) have reopened for outdoor dining at severely reduced capacities and with detrimental material alterations to their premises.[26]  For instance, these locations have been forced to move tables for social distancing, physically demarcate six feet of spacing in customer lines, and erect new physical structures to enable dining and to separate tables where social distancing is not feasible.

341.    As a direct result of the Shutdown and Partial Reopening Executive Orders, USHG has suffered substantial covered losses in an amount that will be proven at trial.

342.    At all relevant times, USHG has had in place an all-risk commercial property insurance policy, No. MCRD38179846, effective July 1, 2019 and renewed on July 1, 2020, with Defendant Indemnity Insurance.[27]  (*See* Ex. 36 to Complaint.)  Indemnity Insurance agreed to

---

[26] Marta briefly reopened for outdoor dining, but has since closed again.

[27] USHG is the first named insured on the policy.  All other named insureds that are not expressly named herein are incorporated by reference and can be found in the attached policies themselves.

98

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 109 of 148 PageID #: 113

cover "the actual loss of Business Income" USHG sustained "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to" the insured properties that is "caused by or result[s] from a Covered Cause of Loss." Indemnity Insurance also agreed to cover USHG's "Extra Expense."

343.    USHG submitted a notice of claim to Indemnity Insurance for covered losses.

344.    On information and belief, USHG has received communications indicating that Indemnity Insurance has denied or will deny coverage of its claims without any valid justification.[28]

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION—DECLARATORY JUDGMENT
### All Plaintiffs Against All Defendants Pursuant to CPLR § 3001

345.    Plaintiffs incorporate and reallege each of the allegations set forth above as if fully set forth herein.

346.    The Policies described in Paragraphs 115-344 are valid and fully enforceable insurance contracts. The Policies provide for coverage for business income losses and extra expenses Plaintiffs incurred as a result of the interruption of business caused by a covered cause of loss.

347.    Plaintiffs submitted claims for covered losses sustained as a direct result of the Shutdown and Partial Reopening Executive Orders, a covered cause of loss.

---

[28] Indemnity Insurance has also denied a similar claim submitted by Plaintiff Grand Central Oyster Bar.

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 110 of 148 PageID #: 114

348.    Plaintiffs were denied (or told they will be denied) business interruption coverage based on Defendant Insurers' position that, among other things, Plaintiffs had not suffered any direct physical loss of or damage to their covered properties as a result of the Shutdown and Partial Reopening Executive Orders.

349.    An actual, justiciable controversy exists between the parties concerning the construction of the terms "direct physical loss of or damage to" covered property.

350.    As a result of this controversy, Plaintiffs seek a declaration from the Court rejecting the Defendant Insurers' position that the Shutdown and Partial Reopening Executive Orders did not cause direct physical loss of or damage to Plaintiffs' insured properties.

## SECOND CAUSE OF ACTION—BREACH OF CONTRACT
### Aurify Brands v. Charter Oak

351.    Aurify Brands incorporates and realleges each of the allegations set forth above as if fully set forth herein.

352.    Aurify Brands and Charter Oak have an enforceable insurance coverage agreement pursuant to which Charter Oak agreed to provide "all-risk" insurance coverage to Aurify Brands, to wit Policy Number P-630-8N591351-COF-19, effective September 5, 2019.   Aurify Brands agreed to, and in fact did, pay insurance premiums under the agreement, and in return Charter Oak agreed to cover Aurify Brands for the "actual loss of Business Income" resulting from the necessary suspension of business caused by "direct physical loss of or damage to" Aurify Brands' insured properties by a covered cause of loss.  Under the agreement, Charter Oak also agreed to cover Aurify Brands' "Extra Expense."

100

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 111 of 148 PageID
#: 115

353.    Aurify Brands has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

354.    Aurify Brands performed all of its obligations under the parties' agreement, including by notifying Charter Oak of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

355.    Charter Oak breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

356.    Aurify Brands has sustained damage as a result of Charter Oak's breach of contract in an amount to be proven at trial.

### THIRD CAUSE OF ACTION—BREACH OF CONTRACT
### Boqueria v. Zurich

357.    Boqueria incorporates and realleges each of the allegations set forth above as if fully set forth herein.

358.    Boqueria and Zurich have an enforceable insurance coverage agreement pursuant to which Zurich agreed to provide "all-risk" insurance coverage to Boqueria, to wit Policy Number CPO 0181459-04, effective August 1, 2019.  Boqueria agreed to, and in fact did, pay insurance premiums under the agreement, and in return Zurich agreed to cover Boqueria for the "actual loss of 'business income'" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Boqueria's insured properties by a covered cause of loss.  Under the agreement, Zurich also agreed to cover Boqueria's "Extra Expense."

359.    Boqueria has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

101

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 112 of 148 PageID #: 116

360.    Boqueria performed all of its obligations under the parties' agreement, including by notifying Zurich of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

361.    Zurich breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

362.    Boqueria has sustained damage as a result of Zurich's breach of contract in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION—BREACH OF CONTRACT
### Branded Restaurants v. Strathmore

363.    The Branded Restaurants incorporate and reallege each of the allegations set forth above as if fully set forth herein.

364.    The Branded Restaurants and Strathmore have an enforceable insurance coverage agreement pursuant to which Strathmore agreed to provide "all-risk" insurance coverage to the Branded Restaurants, to wit Policy Number 8129T23714, effective November 15, 2019.  The Branded Restaurants agreed to, and in fact did, pay insurance premiums under the agreement, and in return Strathmore agreed to cover the Branded Restaurants for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" the Branded Restaurants' insured properties by a covered cause of loss.  Under the agreement, Strathmore also agreed to cover the Branded Restaurants' "Extra Expense."

365.    The Branded Restaurants have sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

102

366.    The Branded Restaurants performed all of its obligations under the parties'
agreement, including by notifying Strathmore of a covered cause of loss under the agreement, and
any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

367.    Strathmore breached the parties' agreement by improperly denying its coverage
obligations, as expressly required under the parties' agreement.

368.    The Branded Restaurants have sustained damage as a result of Strathmore's breach
of contract in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION—BREACH OF CONTRACT
### Broadway Dive v. First Mercury

369.    Broadway Dive incorporates and realleges each of the allegations set forth above
as if fully set forth herein.

370.    Broadway Dive and First Mercury have an enforceable insurance coverage
agreement pursuant to which First Mercury agreed to provide "all-risk" insurance coverage to
Broadway Dive, to Policy Number FMEV112500, effective September 25, 2019.  Broadway Dive
agreed to, and in fact did, pay insurance premiums under the agreement, and in return First
Mercury agreed to cover Broadway Dive for "the actual loss of Business Income" resulting from
the necessary suspension of operations caused by "direct physical loss of or damage to" Broadway
Dive's insured property by a covered cause of loss.  Under the agreement, First Mercury also
agreed to cover Broadway Dive's "Extra Expense."

371.    Broadway Dive has sustained direct physical loss and/or damage from a covered
cause of loss under the parties' agreement.

103

FILED: KINGS COUNTY CLERK 08/04/2020 10:03 AM
NYSCEF DOC. NO: 1

INDEX NO. 514089/2020
RECEIVED NYSCEF: 08/04/2020

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 114 of 148 PageID
#: 118

372.    Broadway Dive performed all of its obligations under the parties' agreement, including by notifying First Mercury of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

373.    First Mercury breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

374.    Broadway Dive has sustained damage as a result of First Mercury's breach of contract in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION—BREACH OF CONTRACT
### Cafe Wha? v. Western World

375.    Cafe Wha? incorporates and realleges each of the allegations set forth above as if fully set forth herein.

376.    Cafe Wha? and Western World have an enforceable insurance coverage agreement pursuant to which Western World agreed to provide "all-risk" insurance coverage to Cafe Wha?, to wit Policy Number NPP8485484, effective September 17, 2019.  Cafe Wha? agreed to, and in fact did, pay insurance premiums under the agreement, and in return Western World agreed to cover Cafe Wha? for the "actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Cafe Wha?'s insured property by a covered cause of loss.  Under the agreement, Western World also agreed to cover Cafe Wha?'s "Extra Expense."

377.    Cafe Wha? has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

104

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 115 of 148 PageID
#: 119

378.    Cafe Wha? performed all of its obligations under the parties' agreement, including

by notifying Western World of a covered cause of loss under the agreement, and any conditions

precedent have been satisfied, waived, excused, or are otherwise inapplicable.

379.    Western World breached the parties' agreement by improperly denying its coverage

obligations, as expressly required under the parties' agreement.

380.    Cafe Wha? has sustained damage as a result of Western World's breach of contract

in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION—BREACH OF CONTRACT
### The Campbell v. United National

381.    The Campbell incorporates and realleges each of the allegations set forth above as

if fully set forth herein.

382.    The Campbell and United National have an enforceable insurance coverage

agreement pursuant to which United National agreed to provide "all-risk" insurance coverage to

the Campbell, to wit Policy Number PMP1103748, effective April 1, 2019 and renewed on April

1, 2020.  The Campbell agreed to, and in fact did, pay insurance premiums under the agreement,

and in return United National agreed to cover The Campbell for the "actual loss of Business

Income" resulting from the necessary suspension of operations caused by "direct physical loss of

or damage to" The Campbell's insured property by a covered cause of loss.  Under the agreement,

United National also agreed to cover "Extra Expense."

383.    The Campbell has sustained direct physical loss and/or damage from a covered

cause of loss under the parties' agreement.

105

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 116 of 148 PageID #: 120

384.    The Campbell performed all of its obligations under the parties' agreement, including by notifying United National of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

385.    United National breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

386.    The Campbell has sustained damage as a result of United National's breach of contract in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION—BREACH OF CONTRACT
### City Winery v. Arch Insurance

387.    City Winery incorporates and realleges each of the allegations set forth above as if fully set forth herein.

388.    City Winery and Arch Insurance have an enforceable insurance coverage agreement pursuant to which Arch Insurance agreed to provide "all-risk" insurance coverage to City Winery, to wit Policy Number SNCMP0030602, effective April 1, 2019.  City Winery agreed to, and in fact did, pay insurance premiums under the agreement, and in return Arch Insurance agreed to cover City Winery for the "actual loss" of "Earnings" resulting from the interruption of business caused by "direct physical loss of or damage to" City Winery's insured properties by a covered peril.  Under the agreement, Arch Insurance also agreed to cover City Winery's "Extra Expense."

389.    City Winery has sustained direct physical loss and/or damage from a covered peril under the parties' agreement.

106

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 117 of 148 PageID #: 121

390.    City Winery performed all of its obligations under the parties' agreement, including by notifying Arch Insurance of a covered peril under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

391.    Arch Insurance breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

392.    City Winery has sustained damage as a result of Arch Insurance's breach of contract in an amount to be proven at trial.

### NINTH CAUSE OF ACTION—BREACH OF CONTRACT
### Dive Bar v. First Mercury

393.    Dive Bar incorporates and realleges each of the allegations set forth above as if fully set forth herein.

394.    Dive Bar and First Mercury have an enforceable insurance coverage agreement pursuant to which First Mercury agreed to provide "all-risk" insurance coverage to Dive Bar, to wit Policy Number FMEV112745, effective November 9, 2019.  Dive Bar agreed to, and in fact did, pay insurance premiums under the agreement, and in return First Mercury agreed to cover Dive Bar for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Dive Bar's insured property by a covered cause of loss.  Under the agreement, First Mercury also agreed to cover Dive Bar's "Extra Expense."

395.    Dive Bar has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

107

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 118 of 148 PageID #: 122

396.    Dive Bar performed all of its obligations under the parties' agreement, including by notifying First Mercury of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

397.    First Mercury breached the parties' agreement by constructively denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Dive Bar's losses, as expressly required under the parties' agreement.

398.    Dive Bar has sustained damage as a result of First Mercury's breach of contract in an amount to be proven at trial.

### TENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Dive 75 v. AXIS

399.    Dive 75 incorporates and realleges each of the allegations set forth above as if fully set forth herein.

400.    Dive 75 and AXIS have an enforceable insurance coverage agreement pursuant to which AXIS agreed to provide "all-risk" insurance coverage to Dive 75, to wit Policy Number AXPK2019RBT01836, effective May 20, 2019, later extended and renewed in July 2020.  Dive 75 agreed to, and in fact did, pay insurance premiums under the agreement, and in return AXIS agreed to cover Dive 75 for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Dive 75's insured property by a covered cause of loss.  Under the agreement, AXIS also agreed to cover Dive 75's "Extra Expense."

401.    Dive 75 has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

108

402.    Dive 75 performed all of its obligations under the parties' agreement, including by notifying AXIS of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

403.    AXIS breached the parties' agreement by constructively denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Dive 75's losses, as expressly required under the parties' agreement.

404.    Dive 75 has sustained damage as a result of AXIS' breach of contract in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Dive 106 v. First Mercury

405.    Dive 106 incorporates and realleges each of the allegations set forth above as if fully set forth herein.

406.    Dive 106 and First Mercury have an enforceable insurance coverage agreement pursuant to which First Mercury agreed to provide "all-risk" insurance coverage to Dive 106, to wit Policy Number FMEV1111467, effective April 23, 2019.  Dive 106 agreed to, and in fact did, pay insurance premiums under the agreement, and in return First Mercury agreed to cover Dive 106 for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Dive 106's insured property by a covered cause of loss.  Under the agreement, First Mercury also agreed to cover Dive 106's "Extra Expense."

407.    Dive 106 has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

109

408.    Dive 106 performed all of its obligations under the parties' agreement, including by notifying First Mercury of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

409.    First Mercury breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

410.    Dive 106 has sustained damage as a result of First Mercury's breach of contract in an amount to be proven at trial.

### TWELFTH CAUSE OF ACTION—BREACH OF CONTRACT
### The DL v. Aspen American

411.    The DL incorporates and realleges each of the allegations set forth above as if fully set forth herein.

412.    The DL and Aspen American have an enforceable insurance coverage agreement pursuant to which Aspen American agreed to provide "all-risk" insurance coverage to The DL, to wit Policy Number WKA FT00740-07, effective February 28, 2020.  The DL agreed to, and in fact did, pay insurance premiums under the agreement, and in return Aspen American agreed to cover The DL for the "actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" the DL's insured property from a covered cause of loss.  Under the agreement, Aspen American also agreed to cover The DL's "Extra Expense."

413.    The DL has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

110

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 121 of 148 PageID #: 125

414.    The DL performed all of its obligations under the parties' agreement, including by notifying Aspen American of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

415.    Aspen American breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

416.    The DL has sustained damage as a result of Aspen American's breach of contract in an amount to be proven at trial.

### THIRTEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Ess-a-Bagel East v. Sentinel

417.    Ess-a-Bagel East incorporates and realleges each of the allegations set forth above as if fully set forth herein.

418.    Ess-a-Bagel East and Sentinel have an enforceable insurance coverage agreement pursuant to which Sentinel agreed to provide insurance coverage to Ess-a-Bagel East, to wit Policy Number 16 SBA IJ7131 SB, effective March 16, 2020.  Ess-a-Bagel East agreed to, and in fact did, pay insurance premiums under the agreement, and in return Sentinel agreed to cover Ess-a-Bagel East for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or physical damage to" Ess-a-Bagel East's insured property by a covered cause of loss.  Under the agreement, Sentinel also agreed to cover Ess-a-Bagel East's "Extra Expense."

419.    Ess-a-Bagel East has sustained direct physical loss and/or physical damage from a covered cause of loss under the parties' agreement.

111

420.    Ess-a-Bagel East performed all of its obligations under the parties' agreement, including by notifying Sentinel of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

421.    Sentinel breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

422.    Ess-a-Bagel East has sustained damage as a result of Sentinel's breach of contract in an amount to be proven at trial.

### FOURTEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Ess-a-Bagel West v. Ohio Security

423.    Ess-a-Bagel West incorporates and realleges each of the allegations set forth above as if fully set forth herein.

424.    Ess-a-Bagel West and Ohio Security have an enforceable insurance coverage agreement pursuant to which Ohio Security agreed to provide insurance coverage to Ess-a-Bagel West, to wit Policy Number BZS (20) 60 14 35 18, effective October 1, 2019.  Ess-a-Bagel West agreed to, and in fact did, pay insurance premiums under the agreement, and in return Ohio Security agreed to cover Ess-a-Bagel West for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Ess-a-Bagel West's insured property by a covered cause of loss.  Under the agreement, Ohio Security also agreed to cover Ess-a-Bagel West's "Extra Expense."

425.    Ess-a-Bagel West has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

112

426.    Ess-a-Bagel West performed all of its obligations under the parties' agreement, including by notifying Ohio Security of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

427.    Ohio Security breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

428.    Ess-a-Bagel West has sustained damage as a result of Ohio Security's breach of contract in an amount to be proven at trial.

### FIFTEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### FGNY v. Acceptance Indemnity

429.    FGNY incorporates and realleges each of the allegations set forth above as if fully set forth herein.

430.    FGNY and Acceptance Indemnity have an enforceable insurance coverage agreement pursuant to which Acceptance Indemnity agreed to provide "all-risk" insurance coverage to FGNY, to wit Policy Number BR00000615, effective September 5, 2019.  FGNY agreed to, and in fact did, pay insurance premiums under the agreement, and in return Acceptance Indemnity agreed to cover FGNY for the "actual loss of Business Income" resulting from the necessary suspension of business caused by "direct physical loss of or damage to" FGNY's insured properties by a covered cause of loss.  Under the agreement, Acceptance Indemnity also agreed to cover FGNY's "Extra Expense."

431.    FGNY has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

113

432.    FGNY performed all of its obligations under the parties' agreement, including by notifying Acceptance Indemnity of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

433.    Acceptance Indemnity breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

434.    FGNY has sustained damage as a result of Acceptance Indemnity's breach of contract in an amount to be proven at trial.

## SIXTEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Global Dining v. Sompo America

435.    Global Dining incorporates and realleges each of the allegations set forth above as if fully set forth herein.

436.    Global Dining and Sompo America have an enforceable insurance coverage agreement pursuant to which Sompo America agreed to provide all-risk insurance coverage to Global Dining, to wit Policy Number COL45974A0 effective November 1, 2019.  Global Dining agreed to, and in fact did, pay insurance premiums under the agreement, and in return Sompo America agreed to cover Global Dining for the loss of business income resulting from "direct physical loss to [Global Dining's] covered property at covered locations caused by a covered peril."  Under the agreement, Sompo America also agreed to cover Global Dining's "Extra Expense."

437.    Global Dining has sustained direct physical loss and/or damage from a covered peril under the parties' agreement.

114

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 125 of 148 PageID
#: 129

438.    Global Dining performed all of its obligations under the parties' agreement, including by notifying Sompo America of a covered peril under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

439.    Sompo America breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

440.    Global Dining has sustained damage as a result of Sompo America's breach of contract in an amount to be proven at trial.

### SEVENTEETH CAUSE OF ACTION—BREACH OF CONTRACT
### Goldbar v. Lexington

441.    Goldbar incorporates and realleges each of the allegations set forth above as if fully set forth herein.

442.    Goldbar and Lexington have an enforceable insurance coverage agreement pursuant to which Goldbar agreed to provide "all-risk" insurance coverage to Goldbar, to wit Policy Number 060437991-00, effective November 5, 2019.  Goldbar agreed to, and in fact did, pay insurance premiums under the agreement, and in return Lexington agreed to cover Goldbar for all "Business Interruption" losses, defined as loss resulting from a "necessary interruption of business" and caused by "direct physical loss or damage" to Goldbar's insured property by a covered peril.  Under the agreement, Lexington also agreed to cover Goldbar's "Extra Expense."

443.    Goldbar has sustained direct physical loss and/or damage from a covered peril under the parties' agreement.

115

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 126 of 148 PageID
#: 130

444.    Goldbar performed all of its obligations under the parties' agreement, including by notifying Lexington of a covered peril under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

445.    Goldbar breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

446.    Goldbar has sustained damage as a result of Lexington's breach of contract in an amount to be proven at trial.

## EIGHTEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Grand Central Oyster Bar v. Indemnity Insurance

447.    Grand Central Oyster Bar incorporates and realleges each of the allegations set forth above as if fully set forth herein

448.    Grand Central Oyster Bar and Indemnity Insurance have an enforceable insurance coverage agreement pursuant to which Indemnity Insurance agreed to provide "all-risk" insurance coverage to Grand Central Oyster Bar, to wit Policy Number MCRD38194574, effective June 26, 2019.  Grand Central Oyster Bar agreed to, and in fact did, pay insurance premiums under the agreement, and in return Indemnity Insurance agreed to cover Grand Central Oyster Bar for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Grand Central Oyster Bar's insured property by a covered cause of loss.  Under the agreement, Indemnity Insurance also agreed to cover Grand Central Oyster Bar's "Extra Expense."

449.    Grand Central Oyster Bar has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

116

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 127 of 148 PageID #: 131

450.    Grand Central Oyster Bar performed all of its obligations under the parties' agreement, including by notifying Indemnity Insurance of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

451.    Indemnity Insurance breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

452.    Grand Central Oyster Bar has sustained damage as a result of Indemnity Insurance's breach of contract in an amount to be proven at trial.

### NINETEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Happy Cooking Restaurants v. Admiral

453.    The Happy Cooking Restaurants incorporate and reallege each of the allegations set forth above as if fully set forth herein.

454.    The Happy Cooking Restaurants and Admiral have an enforceable insurance coverage agreement pursuant to which Admiral agreed to provide "all-risk" insurance coverage to the Happy Cooking Restaurants, to wit Policy Number 21-31188331 - 38, effective July 22, 2019 and renewed on July 22, 2020.  The Happy Cooking Restaurants agreed to, and in fact did, pay insurance premiums under the agreement, and in return Admiral agreed to cover the Happy Cooking Restaurants for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" their insured properties by a covered cause of loss.  Under the agreement, Admiral also agreed to cover the Happy Cooking Restaurants' "Extra Expense."

117

455.    The Happy Cooking Restaurants have sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

456.    The Happy Cooking Restaurants performed all of their obligations under the parties' agreement, including by notifying Admiral of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

457.    Admiral breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

458.    The Happy Cooking Restaurants have sustained damage as a result of Admiral's breach of contract in an amount to be proven at trial.

## TWENTIETH CAUSE OF ACTION—BREACH OF CONTRACT
### Harlem Hookah v. United Specialty

459.    Harlem Hookah incorporates and realleges each of the allegations set forth above as if fully set forth herein.

460.    Harlem Hookah and United Specialty have an enforceable insurance coverage agreement pursuant to which United Specialty agreed to provide "all-risk" insurance coverage to Harlem Hookah, to wit Policy Number USA 4245913, effective May 11, 2019.  Harlem Hookah agreed to, and in fact did, pay insurance premiums under the agreement, and in return United Specialty agreed to cover Harlem Hookah for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Harlem Hookah's insured property by a covered cause of loss.  Under the agreement, United Specialty also agreed to cover Harlem Hookah's "Extra Expense."

118

Case 1:20-cv-04160-MKB-VMS     Document 1-1     Filed 09/04/20     Page 129 of 148 PageID #: 133

461.    Harlem Hookah has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

462.    Harlem Hookah performed all of its obligations under the parties' agreement, including by notifying United Specialty of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

463.    United Specialty breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

464.    Harlem Hookah has sustained damage as a result of United Specialty's breach of contract in an amount to be proven at trial.

### TWENTY-FIRST CAUSE OF ACTION—BREACH OF CONTRACT
### Javelina Union Square v. Admiral

465.    Javelina Union Square incorporates and realleges each of the allegations set forth above as if fully set forth herein.

466.    Javelina Union Square and Admiral have an enforceable insurance coverage agreement pursuant to which Admiral agreed to provide "all-risk" insurance coverage to Javelina Union Square, to wit Policy Number 21-31811031-32, effective October 30, 2019.  Javelina Union Square agreed to, and in fact did, pay insurance premiums under the agreement, and in return Admiral agreed to cover Javelina Union Square for the "actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Javelina Union Square's insured property by a covered cause of loss.  Under the agreement, Admiral also agreed to cover Javelina Union Square's "Extra Expense."

119

467.    Javelina Union Square has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

468.    Javelina Union Square performed all of its obligations under the parties' agreement, including by notifying Admiral of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

469.    Admiral breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

470.    Javelina Union Square has sustained damage as a result of Admiral's breach of contract in an amount to be proven at trial.

### TWENTY-SECOND CAUSE OF ACTION—BREACH OF CONTRACT
### Javelina Upper East Side v. HDI Global

471.    Javelina Upper East Side incorporates and realleges each of the allegations set forth above as if fully set forth herein.

472.    Javelina Upper East Side and HDI Global have an enforceable insurance coverage agreement pursuant to which HDI Global agreed to provide "all-risk" insurance coverage to Javelina Upper East Side, to wit Policy Number GK32X000282-00, effective January 5, 2020. Javelina Upper East Side agreed to, and in fact did, pay insurance premiums under the agreement, and in return HDI Global agreed to cover Javelina Upper East Side for the "actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Javelina Upper East Side's insured property by a covered cause of loss. Under the agreement, HDI Global also agreed to cover Javelina Upper East Side's "Extra Expense."

120

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 131 of 148 PageID #: 135

473.    Javelina Upper East Side has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

474.    Javelina Upper East Side performed all of its obligations under the parties' agreement, including by notifying HDI Global of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

475.    HDI Global breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

476.    Javelina Upper East Side has sustained damage as a result of HDI Global's breach of contract in an amount to be proven at trial.

## TWENTY-THIRD CAUSE OF ACTION—BREACH OF CONTRACT
### Junior's Restaurants v. Hartford

477.    Junior's Restaurants incorporates and realleges each of the allegations set forth above as if fully set forth herein.

478.    Junior's Restaurants and Hartford have an enforceable insurance coverage agreement pursuant to which Hartford agreed to provide "all-risk" insurance coverage to Junior's Restaurants, to wit Policy Number 10UUNDE5221, effective January 1, 2020.  Junior's Restaurants agreed to, and in fact did, pay insurance premiums under the agreement, and in return Hartford agreed to cover Junior's Restaurants for "the actual loss of Business Income" resulting from the necessary interruption of business operations due to "direct physical loss of or direct physical damage to" Junior's Restaurants' insured properties by a covered cause of loss.  Under the agreement, Hartford also agreed to cover Junior's Restaurants' "Extra Expense."

121

479.    Junior's Restaurants have sustained direct physical loss and/or direct physical damage from a covered cause of loss under the parties' agreement.

480.    Junior's Restaurants performed all of its obligations under the parties' agreement, including by notifying Hartford of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

481.    Hartford breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

482.    Junior's Restaurants have sustained damage as a result of Hartford's breach of contract in an amount to be proven at trial.

### TWENTY-FOURTH CAUSE OF ACTION—BREACH OF CONTRACT
### Peasant v. Greenwich

483.    Peasant incorporates and realleges each of the allegations set forth above as if fully set forth herein.

484.    Peasant and Greenwich have an enforceable insurance coverage agreement pursuant to which Greenwich agreed to provide "all-risk" insurance coverage to Peasant, to wit Policy Number PHK-0951483-00, effective January 1, 2020.  Peasant agreed to, and in fact did, pay insurance premiums under the agreement, and in return Greenwich agreed to cover Peasant for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Peasant's insured property by a covered cause of loss.  Under the agreement, Greenwich also agreed to cover Peasant's "Extra Expense."

485.    Peasant has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

122

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 133 of 148 PageID #: 137

486.    Peasant performed all of its obligations under the parties' agreement, including by notifying Greenwich of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

487.    Greenwich breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

488.    Peasant has sustained damage as a result of Greenwich's breach of contract in an amount to be proven at trial.

### TWENTY-FIFTH CAUSE OF ACTION—BREACH OF CONTRACT
### Quality Branded v. Travelers Excess

489.    Quality Branded incorporates and realleges each of the allegations set forth above as if fully set forth herein.

490.    Quality Branded and Travelers Excess have an enforceable insurance coverage agreement pursuant to which Travelers Excess agreed to provide "all-risk" insurance coverage to Quality Branded, to wit Policy Number KTQ-CMB-8473R68-7-19, effective August 28, 2019. Quality Branded agreed to, and in fact did, pay insurance premiums under the agreement, and in return Travelers Excess agreed to cover Quality Branded for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Quality Branded's insured properties by a covered cause of loss.   Under the agreement, Travelers Excess also agreed to cover Quality Branded's "Extra Expense."

491.    Quality Branded has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

123

492.    Quality Branded performed all of its obligations under the parties' agreement, including by notifying Travelers Excess of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

493.    Travelers Excess breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

494.    Quality Branded has sustained damage as a result of Travelers Excess's breach of contract in an amount to be proven at trial.

## TWENTY-SIXTH CAUSE OF ACTION—BREACH OF CONTRACT
### Racines NY v. Admiral

495.    Racines NY incorporates and realleges each of the allegations set forth above as if fully set forth herein.

496.    Racines NY and Admiral have an enforceable insurance coverage agreement pursuant to which Admiral agreed to provide "all-risk" insurance coverage to Racines NY, to wit Policy Number 21-31867231 – 30, effective April 12, 2019 and renewed on April 12, 2020. Racines NY agreed to, and in fact did, pay insurance premiums under the agreement, and in return Admiral agreed to cover Racines NY for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Racines NY's insured property by a covered cause of loss.  Under the agreement, Admiral also agreed to cover Racine NY's "Extra Expense."

497.    Racines NY has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

124

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 135 of 148 PageID
#: 139

498.    Racines NY performed all of its obligations under the parties' agreement, including
by notifying Admiral of a covered cause of loss under the agreement, and any conditions precedent
have been satisfied, waived, excused, or are otherwise inapplicable.

499.    Admiral breached the parties' agreement by improperly denying its coverage
obligations, as expressly required under the parties' agreement.

500.    Racines NY has sustained damage as a result of Admiral's breach of contract in an
amount to be proven at trial.

### TWENTY-SEVENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Red Hook Lobster Pound v. MetLife

501.    Red Hook Lobster Pound incorporates and realleges each of the allegations set forth
above as if fully set forth herein.

502.    Red Hook Lobster Pound and MetLife have an enforceable insurance coverage
agreement pursuant to which MetLife agreed to provide "all-risk" insurance coverage to Red Hook
Lobster Pound, to wit Policy Number BP011456P2019, effective April 22, 2019 and renewed on
April 22, 2020.  Red Hook Lobster Pound agreed to, and in fact did, pay insurance premiums under
the agreement, and in return MetLife agreed to cover Red Hook Lobster Pound for "the actual loss
of Business Income" resulting from the necessary suspension of operations caused by "direct
physical loss of or damage to" Red Hook Lobster Pound's insured property by a covered cause of
loss.  Under the agreement, MetLife also agreed to cover Red Hook Lobster Pound's "Extra
Expense."

503.    Red Hook Lobster Pound has sustained direct physical loss and/or damage from a
covered cause of loss under the parties' agreement.

125

504.    Red Hook Lobster Pound performed all of its obligations under the parties' agreement, including by notifying MetLife of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

505.    MetLife breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

506.    Red Hook Lobster Pound has sustained damage as a result of MetLife's breach of contract in an amount to be proven at trial.

## TWENTY-EIGHTH CAUSE OF ACTION—BREACH OF CONTRACT
### Red Hook Lobster Pound Vanderbilt v. Travelers Casualty

507.    Red Hook Lobster Pound Vanderbilt incorporates and realleges each of the allegations set forth above as if fully set forth herein.

508.    Red Hook Lobster Pound Vanderbilt and Travelers Casualty have an enforceable insurance coverage agreement pursuant to which Travelers Casualty agreed to provide "all-risk" insurance coverage to Red Hook Lobster Pound Vanderbilt, to wit Policy Number 680-1L517925-19-42, effective July 16, 2019 and renewed on July 16, 2020. Red Hook Lobster Pound Vanderbilt agreed to, and in fact did, pay insurance premiums under the agreement, and in return Travelers Casualty agreed to cover Red Hook Lobster Pound Vanderbilt for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Red Hook Lobster Pound Vanderbilt's insured property by a covered cause of loss. Under the agreement, Travelers Casualty also agreed to cover Red Hook Lobster Pound Vanderbilt's "Extra Expense."

126

509.    Red Hook Lobster Pound Vanderbilt has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

510.    Red Hook Lobster Pound Vanderbilt performed all of its obligations under the parties' agreement, including by notifying Travelers Casualty of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

511.    Travelers Casualty breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

512.    Red Hook Lobster Pound Vanderbilt has sustained damage as a result of Travelers Casualty breach of contract in an amount to be proven at trial.

### TWENTY-NINTH CAUSE OF ACTION—BREACH OF CONTRACT
### Schnippers v. Twin City

513.    Schnippers incorporates and realleges each of the allegations set forth above as if fully set forth herein.

514.    Schnippers and Twin City have an enforceable insurance coverage agreement pursuant to which Twin City agreed to provide "all-risk" insurance coverage to Schnippers, to wit Policy Number 12 SBA AA7086 SB, effective May 22, 2019 and renewed on May 22, 2020. Schnippers agreed to, and in fact did, pay insurance premiums under the agreement, and in return Twin City agreed to cover Schnippers for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or physical damage to" Schnippers' insured properties by a covered cause of loss.  Under the agreement, Twin City also agreed to cover Schnippers' "Extra Expense."

127

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 138 of 148 PageID #: 142

515.   Schnippers has sustained direct physical loss and/or physical damage from a covered cause of loss under the parties' agreement.

516.   Schnippers performed all of its obligations under the parties' agreement, including by notifying Schnippers of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

517.   Twin City breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

518.   Schnippers has sustained damage as a result of Twin City's breach of contract in an amount to be proven at trial.

## THRITIETH CAUSE OF ACTION—BREACH OF CONTRACT
### Schnippers v. XL Insurance

519.   Schnippers incorporates and realleges each of the allegations set forth above as if fully set forth herein.

520.   Schnippers and XL Insurance have an enforceable insurance coverage agreement pursuant to which XL Insurance agreed to provide "all-risk" insurance coverage to Schnippers, to wit Policy Number PHK-0951317-00, effective March 18, 2019.  Schnippers agreed to, and in fact did, pay insurance premiums under the agreement, and in return XL Insurance agreed to cover Schnippers for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Schnippers' insured properties by a covered cause of loss.  Under the agreement, XL Insurance also agreed to cover Schnippers' "Extra Expense."

128

Case 1:20-cv-04160-MKB-VMS Document 1-1 Filed 09/04/20 Page 139 of 148 PageID #: 143

521.    Schnippers has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

522.    Schnippers performed all of its obligations under the parties' agreement, including by notifying Schnippers of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

523.    XL Insurance breached the parties' agreement by constructively denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Schnippers's losses, as expressly required under the parties' agreement.

524.    Schnippers has sustained damage as a result of XL Insurance's breach of contract in an amount to be proven at trial.

### THIRTY-FIRST CAUSE OF ACTION—BREACH OF CONTRACT
### Stout v. United Specialty and National Fire

525.    Stout incorporates and realleges each of the allegations set forth above as if fully set forth herein.

526.    Stout has an enforceable insurance coverage agreement with United Specialty and National Fire pursuant to which United Specialty and National Fire agreed to provide "all-risk" insurance coverage to Stout, to wit Policy Number VET-GF00643190, as amended, effective April 10, 2019 and renewed on June 9, 2020.  Stout agreed to, and in fact did, pay insurance premiums under the agreement, and in return United Specialty and National Fire agreed to cover Stout for "the actual loss of Business Income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Stout's insured properties by a covered cause of loss.

129

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 140 of 148 PageID #: 144

Under the agreement, United Specialty and National Fire also agreed to cover Stout's "Extra Expense."

527.    Stout has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

528.    Stout performed all of its obligations under the parties' agreement, including by notifying United Specialty and National Fire of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

529.    United Specialty and National Fire breached the parties' agreement by constructively denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Stout's losses, as expressly required under the parties' agreement.

530.    Stout has sustained damage as a result of United Specialty and National Fire's breach of contract in an amount to be proven at trial.

### THIRTY-SECOND CAUSE OF ACTION—BREACH OF CONTRACT
### Sweetwater Social v. Lexington

531.    Sweetwater Social incorporates and realleges each of the allegations set forth above as if fully set forth herein.

532.    Sweetwater Social and Lexington have an enforceable insurance coverage agreement pursuant to which Lexington agreed to provide "all-risk" insurance coverage to Sweetwater Social, to wit Policy Number 060437567-01, effective November 5, 2019. Sweetwater Social agreed to, and in fact did, pay insurance premiums under the agreement, and in return Lexington agreed to cover Sweetwater for all "Business Interruption" losses, defined to mean loss resulting from a "necessary interruption of business" and caused by "direct physical loss

130

Case 1:20-cv-04160-MKB-VMS     Document 1-1     Filed 09/04/20     Page 141 of 148 PageID #: 145

or damage" to Sweetwater Social's insured property by a covered peril. Under the agreement, Lexington also agreed to cover Sweetwater Social's "Extra Expense."

533.   Sweetwater Social has sustained direct physical loss and/or damage from a covered peril under the parties' agreement.

534.   Sweetwater Social performed all of its obligations under the parties' agreement, including by notifying Lexington of a covered peril under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

535.   Lexington breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

536.   Sweetwater Social has sustained damage as a result of Lexington's breach of contract in an amount to be proven at trial.

## THIRTY-THIRD CAUSE OF ACTION—BREACH OF CONTRACT
### Tarallucci e Vino Admiral Plaintiffs v. Admiral

537.   Tarallucci e Vino Admiral Plaintiffs incorporates and realleges each of the allegations set forth above as if fully set forth herein.

538.   Tarallucci e Vino Admiral Plaintiffs and Admiral have an enforceable insurance coverage agreement pursuant to which Admiral agreed to provide "all-risk" insurance coverage to Tarallucci e Vino Admiral Plaintiffs, to wit Policy Numbers 21-31659631-35 and 21-31065931 – 37, effective March 1, 2020. Tarallucci e Vino Admiral Plaintiffs agreed to, and in fact did, pay insurance premiums under the agreement, and in return Admiral agreed to cover Tarallucci e Vino Admiral Plaintiffs for the "actual loss of Business Income" and the "Extra Expense" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" Tarallucci

131

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 142 of 148 PageID
#: 146

e Vino Admiral Plaintiffs' insured properties by a covered cause of loss. Under the agreement, Admiral also agreed to cover Tarallucci e Vino Admiral Plaintiffs' "Extra Expense."

539.    Tarallucci e Vino Admiral Plaintiffs have sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

540.    Tarallucci e Vino Admiral Plaintiffs performed all of its obligations under the parties' agreements, including by notifying Admiral of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

541.    Admiral breached the parties' agreement by improperly denying its coverage obligations to Tarallucci e Vino Nomad and by constructively denying its coverage obligations or otherwise repudiating its obligation to cover the losses of the remaining Tarallucci e Vino Admiral Plaintiffs, as expressly required under the parties' agreements.

542.    Tarallucci e Vino Admiral Plaintiffs have sustained damage as a result of Admiral's breach of contract in an amount to be proven at trial.

### THIRTY-FOURTH CAUSE OF ACTION—BREACH OF CONTRACT
### Tarallucci e Vino East Village v. Utica First

543.    Tarallucci e Vino East Village incorporates and realleges each of the allegations set forth above as if fully set forth herein.

544.    Tarallucci e Vino East Village and Utica First have an enforceable insurance coverage agreement pursuant to which Utica First agreed to provide "all-risk" insurance coverage to Tarallucci e Vino East Village, to wit Policy Number BOP 12101119 17, effective July 27, 2019 and renewed on July 27, 2020. Tarallucci e Vino East Village agreed to, and in fact did, pay

132

insurance premiums under the agreement, and in return Utica First agreed to cover Tarallucci e Vino East Village for the loss of "Earnings" when the business is "necessarily interrupted by loss or damage to" Tarallucci e Vino East Village's insured property by a covered peril. Under the agreement, Utica First also agreed to cover Tarallucci e Vino East Village's "Extra Expenses."

545. Tarallucci e Vino East Village have sustained loss or damage from a covered peril under the parties' agreement.

546. Tarallucci e Vino East Village performed all of its obligations under the parties' agreement, including by notifying Utica First of a covered peril under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

547. Utica First breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

548. Tarallucci e Vino East Village have sustained damage as a result of Utica First's breach of contract in an amount to be proven at trial.

## THIRTY-FIFTH CAUSE OF ACTION—BREACH OF CONTRACT
### Tito Rocks Bars v. Aspen American

549. The Tito Rocks Bars incorporate and reallege each of the allegations set forth above as if fully set forth herein.

550. The Tito Rocks Bars and Aspen American have an enforceable insurance coverage agreement pursuant to which Aspen American agreed to provide "all-risk" insurance coverage to the Tito Rocks Bars, to wit Policy Number WKAFTC 0109-02, effective November 3, 2019, as amended. The Tito Rocks Bars agreed to, and in fact did, pay insurance premiums under the agreement, and in return Aspen American agreed to cover the Tito Rocks Bars for the "actual loss

133

Case 1:20-cv-04160-MKB-VMS     Document 1-1     Filed 09/04/20     Page 144 of 148 PageID #: 148

of business income" resulting from the necessary suspension of operations caused by "direct physical loss of or damage to" their insured properties from a covered cause of loss. Under the agreement, Aspen American also agreed to cover "Extra Expense" incurred by the Tito Rocks Bars.

551.    Each of the Tito Rocks Bars has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

552.    The Tito Rocks Bars performed all of its obligations under the parties' agreement, including by notifying Aspen American of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

553.    Aspen American breached the parties' agreement by improperly denying its coverage obligations, as expressly required under the parties' agreement.

554.    The Tito Rocks Bars have sustained damage as a result of Aspen American's breach of contract in an amount to be proven at trial.

### THIRTY-SIXTH CAUSE OF ACTION—BREACH OF CONTRACT
### USHG v. Indemnity Insurance

555.    USHG incorporates and realleges each of the allegations set forth above as if fully set forth herein.

556.    USHG and Indemnity Insurance have an enforceable insurance coverage agreement pursuant to which Indemnity Insurance agreed to provide "all-risk" insurance coverage to USHG, to wit No. MCRD38179846, effective July 1, 2019 and renewed on July 1, 2020. USHG agreed to, and in fact did, pay insurance premiums under the agreement, and in return Indemnity Insurance agreed to cover USHG for "the actual loss of Business Income" resulting from the necessary

134

Case 1:20-cv-04160-MKB-VMS    Document 1-1    Filed 09/04/20    Page 145 of 148 PageID #: 149

suspension of operations caused by "direct physical loss of or damage" to USHG's insured properties by a covered cause of loss.  Under the agreement, Indemnity Insurance also agreed to cover USHG's "Extra Expense."

557.    USHG has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

558.    USHG performed all of its obligations under the parties' agreement, including by notifying Indemnity Insurance of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

559.    Indemnity Insurance breached the parties' agreement by constructively denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover USHG's losses, as expressly required under the parties' agreement.

560.    USHG has sustained damage as a result of Indemnity Insurance's breach of contract in an amount to be proven at trial.

### THIRTY-SEVENTH CAUSE OF ACTION—UNJUST ENRICHMENT
**All Plaintiffs Against All Defendants**

561.    Plaintiffs incorporate and reallege each of the allegations set forth above as if fully set forth herein.

562.    In the alternative, if Defendant Insurers' denials of coverage for Plaintiffs' claims for business interruption coverage are upheld, then Defendant Insurers have been unjustly enriched in the amount of excess premium for business interruption coverage they have charged and retained while Plaintiffs' properties have been shut down or functionally impaired as the result of the Shutdown and Partial Reopening Executive Orders.

135

563.    Defendant Insurers have priced and charged premiums for each of the Plaintiffs' respective Policies on the basis of their insured properties operating as fully functional restaurants, venues, bars, and other food service businesses, according to the available square footage at the outset of the policy period.   Accordingly, the insured risks included the prospect of having to pay claims for lost business at levels commensurate with fully operational businesses.

564.    During the time period while Plaintiffs' properties have been lost, damaged, shut down or otherwise functionally impaired by the Shutdown and Partial Reopening Executive Orders, Defendant Insurers' risk of having to pay other business interruption claims has been reduced in many instances to zero and in all instances by substantial monetary amounts.  Each of the Policies contain provisions making Defendant Insurers liable to pay business interruption loss only to the extent it would not have been incurred anyway, such as the provision below taken from the insurance policy between The DL and Aspen American:

> The amount of Business Income loss will be determined based on: (1) The Net Income of the business before the direct physical loss or damage occurred; (2) The likely Net Income of the business if no physical loss or damage had occurred. . .

565.    For example, if Plaintiffs' establishments were to suffer a total fire loss tomorrow, Defendant Insurers would decline to pay any business interruption loss that would have been incurred anyway as the result of the Shutdown and Partial Reopening Executive Orders.

566.    Defendant Insurers know all this, yet they have intentionally continued to charge and collect as "earned"—and Plaintiffs have continued to pay—premiums for which Defendant Insurers, according to their own self-serving justifications for denying coverage, assumed no commensurate risk.

136

567. Defendant Insurers have been unjustly enriched, at Plaintiffs' expense, and should be required to disgorge to Plaintiffs the full amounts of excess premium for business interruption coverage they have unlawfully charged, collected, and retained, as equity and good conscience require.

568. Defendant Insurers misconduct in this respect has been willful, wanton, and in bad faith.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court

a.     declare, as set forth in the First Cause of Action, that the Shutdown and Partial Reopening Executive Orders caused direct physical loss of or damage to Plaintiffs' insured properties;

b.     enter judgment in each Plaintiff's favor and against each respective Defendant Insurer on the breach of contract claims set forth in the Second through Thirty-Sixth Causes of Action, in an amount to be proven at trial, plus pre-judgment interest;

c.     in the alternative, enter judgment in Plaintiffs' favor and against each respective Defendant Insurer on the unjust enrichment claim set forth in the Thirty-Seventh Cause of Action, in an amount to be proven at trial, plus pre-judgment interest;

d.     and grant any such other relief as this Court may deem just and proper.

137

Case 1:20-cv-04160-MKB-VMS   Document 1-1   Filed 09/04/20   Page 148 of 148 PageID #: 152

**Dated:  August 3, 2020**

**Respectfully Submitted,**

*/s/* Jeremy M. Creelan

Jeremy M. Creelan
Michael W. Ross
Seth H. Agata
Jenna E. Ross
JENNER & BLOCK LLP
919 Third Ave., 38th Floor
New York, NY 10022
Telephone:  212-891-1678
Email: jcreelan@jenner.com

John H. Mathias Jr. (*pro hac vice* forthcoming)
David M. Kroeger
Brian S. Scarbrough (*pro hac vice* forthcoming)
Jan A. Larson (*pro hac vice* forthcoming)
Gabriel K. Gillett
Caroline L. Meneau (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: 312-923-2917
Email: jmathias@jenner.com

138